Jerome H. LEMELSON, Plaintiff,

v.

The UNITED STATES, Defendant,

and

Bendix Corporation, and Brown & Sharpe
Manufacturing Company,
Third-Party Defendants.

Nos. 414–79C, 415–79C.

United States Claims Court.

July 26, 1983.

William E. Jackson, Arlington, Va., for plaintiff. Ronald R. Snider, Washington, D.C., of counsel.

A. David Spevack, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, for defendant. Thomas J. Byrnes, Washington, D.C., of counsel.

John E. Kidd, New York City, for third-party defendants with whom of counsel were Charles E. Miller and Stephen J. Harbulak, New York City.

## OPINION ON DEFENDANTS' MOTION TO DISMISS

SETO, Judge:

Plaintiff, Jerome H. Lemelson, alleges that he is entitled to recover, pursuant to 28 U.S.C. § 1498, reasonable and entire compensation for the unauthorized use by or for the United States Government of the inventions claimed in three of his U.S. patents. At the completion of the 26-day presentation of plaintiff's case-in-chief, defendant and both third-party defendants jointly moved for dismissal of these actions for plaintiff's failure to adduce a *prima facie* case of patent infringement.[1]

The only issues *sub judice* on defendants' motion to dismiss are whether plaintiff adduced *prima facie* cases that the inventive devices and methods covered by the claims of the patents in suit have been used by or for the United States. After carefully reviewing all of the testimony proffered and all admitted evidence, this court concludes that plaintiff failed to establish, by a preponderance of the evidence, that the inventions claimed in plaintiff's patents have been used by or for the United States Government. Therefore, plaintiff is not entitled to recover pursuant to 28 U.S.C. § 1498. Accordingly, defendants' motion to

dismiss is granted and plaintiff's complaint is to be dismissed.

### I. *Background*

Plaintiff, Mr. Lemelson, asserts that certain automatic measuring devices which were being used by or for the United States are covered by apparatus claim 1 of the United States Letters Patent No. 3,481,042 (hereinafter the '042 patent) entitled "Surface Sensing Apparatus" issued to plaintiff on December 2, 1969. Plaintiff also asserts that defendant employed the accused measuring machines in operations which infringe method claim 12 of United States Letters Patent No. 3,636,635 (hereinafter the '635 patent) entitled "Automatic Measurement Apparatus," issued to plaintiff on January 25, 1972, and method claim 15 of United States Letters Patent No. 3,226,833 (hereinafter the '833 patent), entitled "Automatic Inspection Apparatus And Method," issued to plaintiff on January 4, 1966. Plaintiff has continuously owned all of the patents involved in this action since their issuance.

The accused devices are all coordinate measuring machines capable of conducting a wide variety of measurements. Plaintiff directed his trial presentation toward the measuring machines of three companies, each of which manufactures two of the accused devices: (1) Digital Electronic Automation Inc. (hereinafter "DEA"), manufacturer of the IOTA 2204 P and the IOTA 1205 DNC; (2) Brown & Sharpe Manufacturing Company (hereinafter "Brown & Sharpe") manufacturer of the Validator 200 and the Validator 300; and (3) Bendix Corporation (hereinafter "Bendix") manufacturer of the Cordax 803 DCC and the Cordax 5000 DCC. Each of the manufacturers offers a wide array of peripheral equipment in conjunction with its coordinate measuring machines. Some peripheral equipment procured in conjunction with the accused devices are pertinent to the issues of patent infringement in this suit, and therefore have also been considered in this decision.

---

1. The patents in suit are U.S. Letters Patent No. 3,481,042; U.S. Letters Patent No. 3,636,635; and, U.S. Letters Patent No. 3,226,833.

Defendants' motion to dismiss was made pursuant to U.S. Court of Claims Rule 102(c), now rule 41(b) of the U.S. Claims Court.

Two manufacturers of the accused devices, Brown & Sharpe and Bendix, entered this action as third-party defendants.[2] Both were represented by counsel at trial and each submitted briefs in support of their joint motion to dismiss.

In this action, only the coordinate measuring machines procured by or used for the United States are at issue. For purposes of determining liability,[3] this court considered only the following accused devices:

(1) The DEA IOTA 2204 P and the IOTA 1205 DNC coordinate measuring machines located at the United States Army's Chrysler Tank Plant (General Dynamic's facility as of January 1982) in Detroit, Michigan;

(2) The Validator 200 DCC coordinate measuring machine located at the Navy's David Taylor Model Basin facility in Washington, D.C.;

(3) The Validator 300 located at the Army's Chrysler Tank Plant in Detroit, Michigan;

(4) The Cordax 803 DCC coordinate measuring machine located at Bendix's Kansas City facility; and

(5) The Cordax 5000 DCC located at the Lockheed facility in Sunnyvale, California.

Although defendant admitted that each of the above-mentioned devices had been procured by or for the United States, defendant did not admit to: (1) the modes in which the devices had been operated; (2) the peripheral equipment used in conjunction with the accused devices; and (3) the machines being operated as had originally been anticipated by the Government. Therefore, it was incumbent upon plaintiff to adduce during trial the particular configuration of each of the accused devices, as well as their respective peripheral equipment, including their computer software.[4]

Moreover, since two of the three patent claims in suit are method claims, plaintiff had the burden of proving the modes in which the accused devices had been operated as well as the manner in which those modes infringed his patent claims. As with the accused devices, only a single operating mode of each of the accused machines is at issue to establish liability. Those modes are:

(1) The measurement of both small and large torsion bar housings using the DEA IOTA 1205 DNC and 2204 P DNC machines at the Army Tank Plant in Detroit;

(2) The measurement of flanged cylinders using the Validator 200 DCC machine at the David Taylor Model Basin facility;[5]

(3) The measurement of a workpiece and a ball plate using the Cordax 803 DCC at Bendix's Kansas City facility; and

(4) The measurement of space shuttle tiles for NASA using the Cordax 5000 at the Lockheed facility in California.

## II. *The Motion to Dismiss*

Defendants' joint motion to dismiss relates solely to issues of patent infringement, since the parties agreed to defer the issues of accounting until liability is decided. Moreover, since defendants have not presented their case-in-chief, the issues subsumed under patent validity, which are defensive issues usually asserted by defendants, have yet to be raised at trial and thus, are not currently before this court.

The present motion to dismiss is brought pursuant to Claims Court Rule 41(b).[6]

---

2. DEA, the other third-party defendant, was not a party nor represented at trial by counsel.

3. The issues of liability were severed from those of accounting pursuant to this court's order of March 9, 1981.

4. All coordinate measuring machines in question used computer software.

5. Plaintiff asserts that the Validator 300 is substantially similar in both structure and operation to the Validator 200. Therefore, for purposes of this motion to dismiss, both machines were considered as being substantially identical.

6. Rule 102(c) of the U.S. Court of Claims was superseded by Rule 41(b) of the U.S. Claims Court by virtue of the transformation of the

**164**

Plaintiff asserts that this motion to dismiss on the grounds of non-infringement is untimely as it requires the court to consider the complicated issues of infringement with only one-half of the trial completed. Plaintiff argues that the court's labors in reviewing the evidence and testimony adduced solely during plaintiff's case-in-chief will be redundant as the court must reconsider the same proof and more in deciding this case after trial has been completed. However, this court will not need to repeat its labor. Plaintiff fell far short of proving a *prima facie* case of infringement. Thus, this case can be dismissed without further offer of proof.

In the present action, plaintiff closed his case-in-chief on June 29, 1982. At that time, defendants orally moved to dismiss under Rule 102(c) on the ground: "that there has been no *prima facie* case made by plaintiff with respect to the accused structures."

The Trial Judge deferred a ruling on the motions to dismiss until after the parties had an opportunity to file memoranda on this issue pursuant to Rule 102(c)(4).

The above-noted Rule 102(c) is based on Rule 41(b) of the Federal Rules of Civil Procedure. *Howard Indus. v. United States,* 126 Ct.Cl. 283, 287, 115 F.Supp. 481 (1953). Rule 41(b) provides in pertinent part:

> After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence.

It is well established that there is no impediment to the granting of motions to

dismiss under Rule 41(b) in patent cases. In *Buettner v. Hansen,* 1 F.R.D. 59, 62 (D.Md.1939), the court stated:

> I am very clearly of the opinion that there is no infringement in this case.
>
> Consequently, my conclusion of law is that the plaintiff's action must be dismissed, on the ground that the defendant structure does *not infringe* the plaintiff's device.
>
> \* \* \* \* \* \*
>
> The decree in the case, or judgment, as we now call it under the new rules of federal civil procedure, 28 U.S.C.A. following section 723c, should simply be *dismissal* of the plaintiff's action, *with prejudice,* as we call it; that is to say, *it acts as an estoppel* against any further suit by plaintiff against defendant in this case for the same cause of action. [Emphasis supplied].

Moreover, the U.S. Court of Claims has granted similar motions to dismiss. In *Price v. United States,* 202 U.S.P.Q. 208, (Ct.Cl., Trial Division 1978), *modified,* 618 F.2d 120 (Ct.Cl.1979), the Trial Division granted defendant's motion for dismissal filed at the close of plaintiff's case-in-chief under Rule 102(c)(1), on the ground that plaintiff had failed to make out a *prima facie* case of infringement. Similarly, the U.S. Claims Court, the successor to the Court of Claims, in *James V. Constant v. United States,* 1 Cl.Ct. 600 (1982), (SETO, J.), allowed defendant's oral trial motion to dismiss the case pursuant to Rule 102(c).

Moreover, in considering a motion to dismiss, the court is not required under Rule 102(c) or Rule 41(b) to make any inferences favorable to plaintiff.

> The Court is *not* to make any special inferences in the plaintiff's favor . . . . Instead it is to weigh the evidence, resolve any conflict in it and decide for itself where the preponderance lies. [9 Wright & Miller, *Federal Practice and Procedure,* § 2371, at pp. 224–25 (1982)]

---

Trial Division of the U.S. Court of Claims into the United States Claims Court on October 1, 1982. *See Federal Courts Improvement Act of*

*1982,* Pub.L. No. 97–164, 96 Stat. 25 (Apr. 2, 1982).

[Footnotes omitted and emphasis supplied].

In *B's Co. v. B.P. Barber & Associates,* 391 F.2d 130, 138 (4th Cir.1968), the circuit court held that:

> The Judge as the trier of the facts was not bound to view the evidence in the light most favorable to the appellant with the attendant favorable inferences and presumptions but was bound to take an unbiased view of all the evidence, direct and circumstantial, and accord it such weight as he believed it entitled to receive. *Allred v. Sasser,* 170 F.2d 233 (7th Cir.1948).

Similarly, in *Motorola, Inc. v. Fairchild Camera and Instrument Corp.,* 366 F.Supp. 1173, 1175–76 (D.Ariz.1973), the district court observed in respect to Rule 41(b) motions:

> The test, simply stated, is that if, from the record as it stands at the end of plaintiff's case, the Court is convinced that the evidence preponderates against plaintiff, the Court is empowered to grant the motion. *Ellis v. Carter,* 328 F.2d 573 (9th Cir.1964).

In *Ellis v. Carter,* 328 F.2d 573, 577 (9th Cir.1964), the circuit court, after briefly reviewing the history of Rule 41(b), concluded as follows:

> Accordingly, the trial court was not required to deny the 41(b) motion even if the evidence, viewed in a light most favorable to the plaintiff, made a *prima facie* case. If, from the record as it stood at the close of plaintiff's case, the court was convinced that the evidence preponderated against Ellis, it was empowered to grant Carter's motion.

### III. *Patents in Suit*

Plaintiff seeks compensation pursuant to 28 U.S.C. § 1498 for the Government's unauthorized use of his patented inventions. Mr. Lemelson has not predicated his suit on patent infringement *per se,* but rather, on his right to compensation for the Government's taking of his patent rights, via its powers of eminent domain. *Motorola, Inc. v. United States,* 1 Cl.Ct. 131 (1983), (SETO,

J.). Plaintiff, however, must still prove that the patent claims in suit were infringed by the Government. Unless the accused devices are determined to infringe the patent claims in suit, the government cannot be said to have taken any of plaintiff's patent rights. Therefore, even though differences exist between claims for compensation under 28 U.S.C. § 1498, and claims for the tort of patent infringement under 35 U.S.C. §§ 271, 281, the proof required to demonstrate liability, under either theory of recovery, is substantially synonymous. *See Leesona Corp. v. United States,* 220 Ct.Cl. 234, 599 F.2d 958, 202 U.S.P.Q. 424, *cert. denied,* 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979).

The analysis undertaken to determine patent infringement was succinctly delineated by the U.S. Court of Claims, as follows:

> In summary, the determination of patent infringement is a two-step process. First, the meaning of the claims in issue must be determined by a study of all relevant patent documents. Secondly, the claims must be read on the accused structures. In doing this, *it is of little value that they read literally on the structures. What is crucial is that the structures must do the same work, in substantially the same way, and accomplish substantially the same result to constitute infringement.* This is the general approach which this court uses to determine the infringement of all the patent claims properly before it in this case. [*Autogiro Co. of America v. United States,* 181 Ct.Cl. 55, 68, 384 F.2d 391, 401, 155 U.S.P.Q. 697, 705 (1967), *rehearing denied,* 184 Ct.Cl. 801 (1968) ] [Emphasis supplied].

Therefore, before this court can render a decision on whether the accused measuring devices and their operation infringe any of the claims in suit, it must first construe those claims so as to understand not only the literal meaning of the claims, but also to appreciate the ultimate scope of the claims. *Autogiro Co. of America v. United States,* 181 Ct.Cl. at 68, 384 F.2d at 401, 155

U.S.P.Q. at 705; *Tate Eng'g v. United States,* 201 Ct.Cl. 711, 477 F.2d 1336 (1973).

■ Patent claims, must be construed in light of the patent's specification, drawings, and prosecution history. *Autogiro,* 181 Ct.Cl. at 68, 384 F.2d at 401, 155 U.S.P.Q. at 705; *Barrett v. United States,* 186 Ct.Cl. 210, 405 F.2d 502 (1968). However, at this juncture of trial, the prosecution histories of the patents in suit and their implications have not been adduced. Thus, the patent claims must now be construed without benefit of their histories as patent applications before the United States Patent and Trademark Office.

However, the lack of prosecution histories does not adversely encumber this court's interpretation of the claims inasmuch as the prosecution histories would serve only to narrow an otherwise broader interpretation of the claims. Thus, the court's broader interpretation of the claims in suit reinforces and buttresses plaintiff's infringement assertions. In other words, the prosecution history of the patents would not serve to expand the scope of the claims, but only to narrow them. *Cutter Laboratories v. Lyophile-Cryochem Corp.,* 179 F.2d 80, 87 (9th Cir.1949). Thus, a finding that the claims were not infringed, would not change if the claims later were construed more narrowly.

■ Moreover, in order to prove infringement, it is not sufficient for plaintiff to prove that the claims literally read on the accused structure, since it is possible to have apparent literal infringement, although the end result is still non-infringement. As stated in *Autogiro:*

The use of the various parts of the patent to determine the meaning of the claims is only half the process of determining patent infringement. The other half is "reading the claims on the accused structures." If the claims read literally on the accused structures, an initial hurdle in the test for infringement has been cleared. The race is not over; it has only started. To allow literality to satisfy the test for infringement would force the patent law to reward literary skill and not mechanical creativity. And since the

law is to benefit the inventor's genius and not the scrivener's talents, *claims must not only read literally on the accused structures, but also the structures must "do the same work, in substantially the same way, and accomplish substantially the same result." Dominion Magnesium Ltd. v. United States,* 162 Ct.Cl. 240, 252, 320 F.2d 388, 396, 138 U.S.P.Q. 306, 312 (1963). This approach of making literal overlap only a step and not the entire test of infringement has been consistently applied by the courts since *Westinghouse v. Boyden Power Brake Co.,* 170 U.S. 537 [18 S.Ct. 707, 42 L.Ed. 1136] (1898), where Justice Brown stated at 568 [18 S.Ct. at 722]:

* * * The patentee may bring the defendant within the letter of his claims, but if the latter has so far changed the principle of the device that the claims of the patent, literally construed, have ceased to represent his actual invention, his is as little subject to be adjudged an infringer as one who has violated the letter of a statute has to be convicted, when he has done nothing in a conflict with its spirit and intent. * * *

[*Autogiro,* 181 Ct.Cl. at 66–67, 384 F.2d at 399–400, 155 U.S.P.Q. at 704] [Emphasis supplied].

■ Consequently, claim construction is a two-tiered analysis. In the first tier, the language of the claim is construed, and in the second, the claimed invention is defined. Thus, this court must first construe each of the claims in suit, and then evaluate the accused devices.

The first tier of claim construction involves interpreting the language of the claims. A cardinal tenet of patent law is that the claims represent the metes and bounds of the patent protection. *Strumskis v. United States,* 200 Ct.Cl. 668, 474 F.2d 623, 177 U.S.P.Q. 78, *cert. denied,* 414 U.S. 1067, 94 S.Ct. 576, 38 L.Ed.2d 472 (1973); *Lockheed Aircraft Corp. v. United States,* 213 Ct.Cl. 395, 413–14, 553 F.2d 69–80, 193 U.S.P.Q. 449, 458 (1977). Thus, the lan-

guage of the claim is the focal point of any claim-construction analysis. The claim language is to be searched to determine precisely which elements are incorporated into the claimed invention. Any element not delineated in the claim shall not be construed into the claim.

However, the language of a patent claim is not created in a vacuum. "[P]atent construction is not a matter of pure literalism and slavish adherence to the words used" in the claim. *Weidman Metal Masters Co. v. Glass Master Corp.,* 623 F.2d 1024, 1029, 207 U.S.P.Q. 101, 105 (5th Cir. 1980), *cert. denied,* 450 U.S. 982, 101 S.Ct. 1519, 67 L.Ed.2d 817 (1981). Included with each claim is a specification which should clearly and precisely disclose the invention. 35 U.S.C. § 112 (1965). Thus, the scope and breadth of the claim can only be discerned from a careful study of the patent's specification and drawings. *Autogiro Co. of America v. United States,* 181 Ct.Cl. 55, 384 F.2d 391, 155 U.S.P.Q. 697 (1967). The specification is a reference which expounds the structure and operation of each claimed element. As with the prosecution history, a patent's specification cannot expand the claim's coverage to devices which are beyond the plain import of the claim, but may restrict the scope of a claim. *Dvorsky v. United States,* 173 Ct.Cl. 638, 352 F.2d 373 (1965). Therefore, as to each of the three patent claims in suit, this court must dissect each claim and discern the support and description in the patent's specification for each claim element.

## IV. *The '833 Patent*

Plaintiff's '833 patent was filed as application serial no. 250,942 on January 11, 1963, for an invention entitled "Automatic Inspection Apparatus and Method." Of the 20 claims included in the '833 patent, only method claim 15 is at issue. The inventive method covered in claim 15 is described in the specification as a method directed to an automatic measurement of the distance between two surfaces on a workpiece. The method of claim 15 is disclosed as being executed by the measurement devices illustrated in figures 1, 7, and 9 of the '833 patent.

The specification and drawings of the '833 patent describe several embodiments of the apparatus delineated in claim 15. Figures 1, 7, and 9, reproduced below, illustrate the invention of claim 15 with sufficient clarity so that the claim may be more clearly understood.

FIG.1

FIG.7

Fig. 9

Briefly, the patented measuring device comprises two fundamental components: (1) a measuring head which conducts the measurement, and (2) a manipulation means which automatically positions the measuring head into alignment with the workpiece to be measured. Several embodiments of the measuring head disclosed in the '833 patent are: the caliper (31) in figure 1; the pair of jaws (32 and 33) in figure 7; and the photodetector (80) in figure 9. The manipulation means is also disclosed in several embodiments, e.g., the mechanical arm (24) in figure 1, and the mobile worktable (WB) in figure 7.

The operation of one embodiment of the measuring device disclosed in the '833 patent is described as follows:

In FIG. 1 an automatic measuring apparatus 10 is movable along an overhead track 11 and/or a floor mounted track 21 for prepositioning its measuring head probe assembly 31 relative to work in-progress generally designated W. The

work W may be prepositioned on a base 9 which may comprise a work table or a conveyor adapted also to bring the work into alignment with the measuring apparatus 10.

The measuring apparatus 10 is shown having a programming controller CO shown mounted in a housing secured to the apparatus which preferably includes easily presettable or programmable control elements operatively connected for controlling the various servo motors [MR, Mx, Mz, MR2, MA2] associated with the measuring apparatus to preposition the measuring head, for example, directly over the position of the workpiece or assembly W to measure a dimension such as D . . . . In addition to prepositioning the measuring head 31, the controller CO preferably further effects movement of one or more contact or proximity probes [SW1 and SW2] associated with measuring head 31 which are automatically halted and retracted upon sensing a surface comprising one of the plurality of surfaces across which measurement is desired. Initiation of the operation of controller CO may be manually effected once the assembly 10 is in a predetermined position relative to the workpiece W or by automatic means . . . . [line 43, Col. 2 through line 2, Col. 3, of the '833 patent].

Another embodiment of the measuring head 80 is illustrated in figure 9. The measuring head senses the surface of a workpiece by means of a light beam (83 to 84) and a photo-detector 84. The light-sensitive measuring head 80 is attached to a manipulation means, (such as the mechanical arm (24), fig. 1) which pre-positions measuring head 80 into alignment with the workpiece.

An electrical schematic diagram of the disclosed measuring device is presented in figure 7. The schematic diagram illustrates the control lines running from the program controller CO,[7] to the servo motors, Mx, My, and Mz, which maneuver the arms of manipulation means 24, in figure 1, as they pre-position the measuring head. The program controller also directs the operation of servo 37, which advances and retracts jaw 33 on the measuring head.

The automatic measuring method covered by claim 15 comprises six steps. Claim 15 states:

A method of automatically measuring dimensions between surfaces of a workpiece comprising the steps of:

(1) relatively prepositioning a workpiece and an automatic measurement device;

(2) detecting a first surface of said workpiece by means of surface positional indicating means;

(3) thereafter relatively moving said surface positional indicating means and said workpiece and automatically generating signals indicative of the degree of said movement;

(4) detecting a second surface of said workpiece with said surface position indicating means when said second surface is aligned therewith;

(5) integrating the signals generated during the movement of said workpiece and said surface detecting means between said first and second surfaces; and

(6) generating a further signal indicative of the distance between said first and second surfaces. [Labeling of claim steps supplied].

The first step of claim 15, "relatively prepositioning a workpiece and an automatic measurement device," is described as being automatically executed in one of two ways.[8] The first is to automatically posi-

---

7. The CO program controller appears in the far left hand portion of figure 7.

8. The first step of claim 15 is limited to automatic pre-positioning of the workpiece and the measurement device for these three reasons: (1) The '833 patent, in twelve instances, refers to the automatic pre-positioning of the workpiece and the measuring instruments. On the other hand, no mention is made in the '833 specification to fully manual pre-positioning. See '833 patent at col. 1, lines 27–31; col. 2, lines 43–50, 51–59, 64–70; col. 3, lines 48–54; col. 4, lines 45–57; col. 5, lines 2–7, 62–67; col. 6, lines 17–26; col. 7,

tion the workpiece *W* (*WK* in fig. 9) relative to the measuring device by means of a motorized worktable *WB,* figure 7. The alternative is for the measuring device to automatically maneuver its measuring head (31 in fig. 1, 32 in fig. 7, and 80 in fig. 9) to a predetermined position, which if the workpiece has been properly placed, will cause the measuring head to straddle the workpiece, as shown in figures 1, 7, and 9. Figures 1, 7, and 9, show the positions of the workpiece and the measuring device after step one has been completed.

It is essential that the workpiece be properly aligned with respect to the measuring head. In figure 1, for a proper measurement, the workpiece must be positioned between the jaws of the caliper, such that the dimension (D) of the workpiece being measured is aligned coaxially to the axis formed by the two contact probes, SW1 and SW2, of the caliper jaws, 32 and 33.

Step 2 of method claim 15, "detecting a first surface of said workpiece by means of surface positional indicating means," is described in the '833 specification as the engagement of the first surface-sensing means (contact probe SW1 on jaw 32 in fig. 1, contact probe 48 in fig. 7, and the light beam of the photodetector, 83 to 84 in fig. 9) with a surface on the workpiece. The two surface-sensing means are incorporated into the measuring head. In all of the embodiments of the invention disclosed in the '833 patent, step 2 is effected by automatically maneuvering one of the surface-sensing means into either direct or indirect contact with the workpiece, which, in turn, causes a signal to be transmitted to the computer controller (see line 48a in fig. 7). The point of engagement between the surface-sensing means and the workpiece is the reference point from which measurements are taken.

The third step of claim 15 is "relatively moving said surface positional indicating means and said workpiece and automatically generating signals indicative of the degree of said movement." The third step begins the actual measurement of the workpiece. During the third step, the second surface-sensing means (contact probe SW2 on jaw 33 in fig. 1, contact probe 49 on jaw 33 in fig. 7, and the light beam, 83 to 84, in the photodetector 80 in fig. 9) is advanced toward the workpiece. While the sensing means is being advanced, a train of electronic pulses is generated. Each pulse represents a uniform incremental distance traveled by the surface-sensing means. The counter (62) totals the number of pulses and relays the total to the computer (64). Computer 64 then calculates the distance traversed by the second-surface sensing means, e.g. jaw 33.

The embodiment illustrated in figure 9 is equipped with a slightly different sensing means and measuring head than is disclosed in figures 1 and 7. The measuring head does not comprise a caliper, as shown in figures 1 and 7, but rather is a photodetector (80 in fig. 9). The photodetector emits a light beam (83 to 84), which is monitored by detector 84. If the light beam is broken by a solid object, such as the workpiece, detector 84 senses the shadow and signals the computer that a surface has been encountered. After this first surface (D1) has been detected, step 1 of claim 15, photodetector 80, while generating a train of electronic pulses, traverses the distance from the first surface of the workpiece to the second surface along line D1, in execution of step 2. Thus, the photodetector functions as a first and second surface-sensing

---

line 39 through col. 8, line 32; col. 9, lines 53–58; and col. 12, lines 42–53.

(2) The preamble of claim 15 entitles the inventive method "automatically measuring dimensions . . . ."; and

(3) The citations from the '833 patent proffered by plaintiff to support his proposition that manual pre-positioning is within the scope of claim 15, are unpersuasive. The devices disclosed in each of those citations automatically pre-position both the workpiece and the measuring device; in each instance, also mentioned, is that either the workpiece or the measuring device may also be manually pre-positioned. However, the '833 patent does not teach a completely manual pre-positioning step. *See* '833 patent specification col. 2, lines 43–50; col. 2, line 64 through col. 3, line 2; and, col. 4, lines 45–57.

means. Although the photodetector measuring head (80, fig 9) and the caliper jaws (32 and 33, figs. 1 and 7) operate under different principles, their operation achieves the same result in an analogous manner. Consequently, for purposes of construing claim 15, there is no difference between the two.

The fourth step of claim 15, "detecting a surface of said workpiece with said position indicating means when said second surface is aligned therewith," is described in the specification as, simply the engagement of the second surface-sensing means, (e.g. jaw 33, figures 1 and 7), with the workpiece. This jaw stops when it engages the workpiece, causing the electronic pulses to stop as well. Similarly, the embodiment, illustrated in figure 9, senses the surface of the workpiece, but by means of a photodetector (80). When the photodetector senses the second surface, its advance is halted and the electronic pulse train ceases.

The fifth step of claim 15, "integrating the signals generated during the movement of said workpiece and said surface detecting means between said first and second surfaces," simply requires that the number of pulses generated during step 3 be integrated, i.e. summed together. Because each pulse represents one increment of distance traversed by the sensing head, the total of all of the pulses will be indicative of the total distance traversed by the sensing head.

The sixth and final step of claim 15, "generating a further signal indicative of the distance between said first and second surfaces," completes the measurement. The integrated electronic pulse train, step 5, must be converted into useable form, namely, a linear measurement. The total number of pulses represents the distance which the second surface-sensing means (jaw 33 in figures 1 and 7, and photodetector 80 in figure 9) traveled before it encountered the second surface of the workpiece.

The distance traveled by the photodetector (80, in fig. 9) is also the dimension of the workpiece being measured. Thus, the total number of pulses generated in step 3 is multiplied by the distance represented by each pulse, to calculate the distance between the surfaces of the workpiece.

The devices illustrated in figures 1 and 7 employ a caliper measuring head, having two jaws (32 and 33). The dimension being measured is not the distance which jaw 33 travels, but rather the distance remaining between the jaws of the caliper after both jaws have engaged the workpiece. However, the integration of pulses in step 5, is indicative of the distance traveled by the jaw 33. Thus, in order to calculate the distance between the jaws after they have been brought into contact with the workpiece, it is first necessary to subtract the distance traveled by jaw 33 from the distance which existed between the jaws prior to step 3. The distance remaining between the jaws of the caliper is the workpiece dimension being measured.

## V. The '635 Patent

Plaintiff's '635 patent was filed as application serial no. 864,510 on October 7, 1969, for an invention entitled "Automatic Measurement Apparatus." The specification and drawings of the '635 patent are substantially similar to those of the '833 patent. Figures 1, 7, and 9, of the '635 patent are identical to figures 1, 7, and 9 of the '833 patent.[9]

The specification of the '635 patent discloses a method for automatically measuring dimensions and presenting the measurement obtained in visually readable form. To that end, the '635 patent specification states:

Accordingly, it is a primary object of this invention to provide a new and improved automatic ... method for deriving information representative of dimensions, surface locations and variations from tolerance in an automatic manner and presenting such information in visu-

9. All numerical references herein regarding the '635 patent relate to the illustrations

presented for the '833 patent.

ally readable digital or character form. [Col. 1, lines 42–47 of the '635 patent].

Only claim 12 of the '635 patent is in suit. The method of claim 12 is:

A method for automatically measuring dimensions comprising:

(1) predeterminately locating a member containing dimensions to be measured and a surface-sensing probe;

(2) relatively moving said probe and said surface;

(3) generating pulse signals with said relative movement and feeding said pulsed signals to a summing means;

(4) summing said pulse signals derived from said relative movement;

(5) indicating when said probe senses the the [sic] surface by generating a control signal;

(6) applying said control signal to control the summing of said pulse signals whereby the pulse signals generated at the time said surface is sensed by said probe are presented in the form of digital information on the output of said summing means; and

(7) applying said digital information signals to activate a visual presentation means to visually indicate the distance travelled by said probe in intelligible form. [Labeling of claims steps supplied].

Claim 12 covers a method similar to that covered by claim 15 of the '833 patent.

Step 1 of claim 12 of the '635 patent which reads, "predeterminately locating a member containing dimensions to be measured and a surface-sensing probe," is disclosed as a step in which either the workpiece (W in figure 1) or the surface-sensing probe (measuring head 31 in figures 1 and 7, and photodetector 80 in figure 9) is automatically maneuvered into a predetermined position. In either case, step 1 causes the workpiece and the measuring head to be aligned such that the selected dimension of the workpiece may be measured. For example, in the embodiment illustrated in figure 1, step 1 would be executed as jaw 32 of the surface-sensing head 31 is maneuvered by mechanical arm 24 into engagement

with workpiece W. Step 1 would be completed once the contact probe SW1 had engaged the surface of the workpiece W. The surface-sensing probe of claim 12 is similar to the position indicating means of claim 15 of the '833 patent.

Step 2, "relatively moving said probe and said surface," and step 3, "generating pulse signals with said relative movement and feeding said signals to a summing means," are executed simultaneously. Step 2 commences the actual measurement. During step 2, the surface-sensing means is advanced toward the workpiece. The device illustrated in figure 7 executes step 2, by advancing jaw 33 toward the workpiece W. As the sensing means is advanced toward the workpiece, a train of electronic pulses is generated, step 3. Each pulse is indicative of an increment of distance traveled during the advance of jaw 33 (figs. 1 and 7). The train of electronic pulses is fed into a summing means which counts each pulse.

The device illustrated in figure 7, executes step 3, by means of a counter (62), which counts each rotation of screw shaft 36' as the screw advances jaw 33 toward the workpiece W. In the embodiment shown in figure 9, step 3 is executed by means of a train of electronic pulses generated as photodetector 80 traverses distance D1. The pulses are counted by counter 86.

During step 4, the electronic pulses generated during step 3 are summed together. Since each pulse represents a unit of travel of the surface-sensing probe, (e.g. jaw 33, figs. 1 and 7, and photodetector 80, fig. 9), the total number of pulses represents the total distance traveled by the probe.

Step 5 of claim 12, "indicating when said probe senses the the [sic] surface by generating a control signal," occurs when the probe, which is advancing toward the workpiece, step 2, engages the opposing surface of the workpiece. The measuring device shown in figure 7 effects step 5 by means of a surface-contact switch (49), on jaw 33. When jaw 33 engages the workpiece, switch 49 causes a stop signal to be sent to the read-unit (63) of counter 62.

Step 6, "applying said control signal to control the summing of said pulse signals whereby the pulse signals generated at a time said surface is sensed by said probe are presented in the form of digital information on the output of said summing means," is the end result of step 5. In figure 7, switch 49's control signal is generated when the jaw touches the workpiece and freezes counter 62 at the total number of pulses received prior to the engagement of jaw 33 with the workpiece. The resulting number in the counter is equal to the number of pulses generated during the advance of jaw 33 toward the workpiece in steps 2 and 3.

The seventh and final step of claim 12 is, "applying said digital information signals to activate a visual presentation means to visually indicate the distance travelled by said probe in intelligible form." Step 7 converts the total number of pulses counted into a meaningful measurement, and presents the measurement visually. In figure 9, the distance D1 is both the dimension being measured and the distance which photodetector 80 travels during step 2. Thus, the pulses generated during the advance of photodetector 80, during steps 3 and 4, are indicative of the dimension D1 being measured. During step 7, the total number of pulses counted by the counter is converted into a measurement and visually projected.

## VI. The '042 Patent

Plaintiff's '042 patent was filed as application serial no. 294,076 on July 10, 1963, and issued on December 2, 1969, for an invention entitled "Surface Sensing Apparatus." Only claim 1, which claims a measuring apparatus, is at issue. The specification and drawings of the '042 patent describe several embodiments of the invention. Figures 1, 3, 4, and 5 of the '042 patent, reproduced below, illustrate the claimed invention with sufficient clarity so that claim 1 may be expounded hereinafter. Figures 3 and 4 illustrate one embodiment of the invention; in both figures the means for sensing a surface W are shown in detail, but the manipulation means (11) is only partially illustrated.

FIG.1

FIG.3

FIG.4

FIG. 5

Claim 1 of the '042 patent states: Surface measuring apparatus comprising:

(1) means for sensing a surface to be measured;

(2) manipulation means for said sensing means;

(3) a variable program control means for controlling the operation of said manipulation means and positioning said sensing means adjacent a surface to be measured, said program control means including:

(a) a record member; and

(b) means for reproducing positional control signals from said record member;

(4) means for using said positional control signals to preposition said sensing means;

(5) means for relatively positioning said workpiece and said manipulation means;

(6) signal generating means associated with said manipulation means and said sensing means for obtaining signals representative of the location of a surface of said workpiece relative to said manipulation means; and

(7) recording means for recording said signals representative of the surface being measured on predetermined areas of said recording member.

The invention encompassed by claim 1 of the '042 patent is a measuring apparatus capable of automatically positioning an inspection probe (15 in figs. 1 and 5, and 30 in fig. 3) to a predetermined position adjacent to the workpiece (W), and then automatically controlling the operation of the inspection probe as it measures the workpiece.

The first element of claim 1 is a "means for sensing a surface to be measured." The surface-sensing means is described in the '042 patent as a probe sensor (23 in figures 1 and 4, and 25 in figure 5) which generates a signal upon contact with the workpiece being measured. The surface sensing means is incorporated into the probe.

The second element of claim 1, "manipulation means for said sensing means," positions the surface-sensing means and the probe adjacent to the workpiece. The manipulation means (12 in fig. 1, and 11 in figs. 3 and 4) positions the sensing means into alignment with the workpiece, thus completing the initial steps of both method claims in suit (claim 12 of the '635 patent and claim 15 of the '833 patent). Having positioned the sensing means (depicted as sensing head 30 in figures 3 and 4), the manipulation means 11 is locked into position so as to prove a stationary reference from which measurements are made. Two embodiments of the manipulation means are disclosed in the '042 patent. The first is an adjustable worktable (WP) which maneuvers the workpiece into position relative to the sensing head. The second, partially illustrated in figures 3 and 4, is a mechanical arm (11) which maneuvers the surface-sensing means adjacent to the workpiece. The manipulation means operates automatically, because its operation is governed by the program control means delineated in step 3.

The third element of claim 1 is a "variable program control means for controlling the operation of said manipulation means and positioning said sensing means adjacent a surface to be measured, said program control means including a record member and means for reproducing positional control signals from said record member." The variable program control means is disclosed as the computer controller which affects the automatic operation of the measuring device. The program means is comprised of a record member (illustrated as a magnetic tape (51 in figure 5)) and a means for reproducing the positional control signals stored in the record member (59 and 58, figure 5). A primary function of the program controller is to direct the movement of manipulation means 11 and 12 by controlling the servo motors (63, 63–2, and 63–3, figure 5) which drive the manipulation means. The instructions for the manipulation means are prerecorded onto the record member 49. The program controller executes these prerecorded instructions to operate the manipulation means such that the surface-sensing means is properly maneuvered into alignment with the workpiece.

The fourth element of the claimed invention, a "means for using said positional con-

trol signals to preposition said sensing means," is the computer controller for the series of servo motors (63, 63-2, and 63-3) which provide locomotion for manipulation means 11 and 12. The '042 patent describes the means for executing the positional control signals by stating that "the inspection probe assembly 15 [the inspection probe is analogous to the sensing means] may be *automatically* positioned at substantially an infinite number of locations in space within a given region to effect predetermined positioning of the inspection probe assembly 15. *Such positioning may be effected by variable programming means of known design* * * *." [Lines 48-54, column 2 of the '042 patent] [Emphasis supplied].

Element five of claim 1, "means for relatively positioning said workpiece and said manipulation means," is described as follows:

> In the operation of the automatic surface sensing apparatus described herein, a *positional relationship must be established between the carrier or manipulation means such as base 12 or a mount on which said base is moveable, and the work being measured.* Accordingly, the work W is shown in FIG. 1 as being retained and prepositioned by a work holding feature WP, such as an automatic clamping means which engages a portion of the work * * *. [Lines 30-37, col. 3 of the '042 patent] [Emphasis supplied].

Element 6 of claim 1 is a "signal generating means associated with said manipulation means and said sensing means for obtaining signals representative of the location of a surface of said workpiece relative to said manipulation means." The signal generating means is shown schematically in figure 5 of the '042 patent. The signal generating means (55) is cammed to probe shaft (22) such that cam (56) follows the ridges (22') on the probe shaft. The movement of cam 56 is monitored by signal generating means 55, which emits electronic pulses in response to the cam's rotations. The pulses are representative of the distance traveled by surface-sensing probe 25

(23 in figs. 1 and 4) as it is advanced by probe motor 43 toward workpiece (25A).

After the sensing head has been aligned with the workpiece, probe motor 43, is activated. The surface-sensing probe is advanced by the probe motor either along the tracks (38 and 46, fig. 3) of surface-sensing head (30), or by the probe shaft (22, figs. 1 and 5). In either instance the movement of the probe generates signals, via signal generator 55, indicative of the degree of the probe's movement. The pulses are summed by pulse counter 53.

It is important to note that not all movements of probe 23 generate signals. While the sensing head, to which the probe is appended, is being pre-positioned into alignment with the workpiece, no signal is generated. Only after the sensing head is pre-positioned, and while the sensing head is being held stationary by the manipulation means, does the probe generate pulse signals. Consequently, it is the distance traveled by the probe, relative to the stationary sensing base plate (31, fig. 3), which is being measured. Because the measuring device only measures the distance traveled by the probe relative to the the [sic] sensing head, claim 1 includes the limitation that the signals generated be representative of the location of a surface workpiece, "relative to said manipulation means."

For example, the embodiment illustrated in figures 3 and 4 generates electronic pulse signals only while probe 23 traverses the face of the sensing head 30. Thus, the signals are representative of the distances traveled by the probe relative to the face (31) of the sensing head. Moreover, since sensing head face 31 is rigidly affixed to manipulation means 11B, the probe movements are measured with respect to the manipulation means. Hence, the inherent claim limitation is "relative to said manipulation means."

The seventh and final element of claim 1 in the '042 patent is: "recording means for recording said signals representative of the surface being measured on predetermined areas of said recording member." The signals representative of the surface being

measured are simply those referred to in element six as indicative of the movement of the probe. The recording means is illustrated in figure 5 as a computer memory (51), e.g. a magnetic tape, which records the signals emitted by pulse counter 53. The signals are recorded on a predetermined section of the computer memory so that the location of the recorded probe movement signals will be known and, therefore, will be retrievable.

Having construed all of the claims in suit and discerned their scope and meaning through a study of the patents' specifications, this court proceeds to the second step of its two-part patent infringement analysis: Part "a" is to read each of the claims on the accused devices and methods. Part "b" is to ascertain whether each of the accused devices do the same work, in substantially the same way, to achieve substantially the same result. Thus, simply reading the claims on an accused device or method is insufficient. The Court of Claims cautioned against merely reading patent claims on the accused structure. In *Autogiro Co. of America v. United States*, 181 Ct.Cl. 55, 66, 384 F.2d 391, 399–400, 155 U.S.P.Q. 697, 704 (1967), *rehearing denied*, 183 Ct.Cl. 801 (1968), the court stated:

The use of the various parts of the patent to determine the meaning of the claims is only half the process of determining patent infringement. The other half is 'reading the claims on the accused structures.' If the claims read literally on the accused structures, an initial hurdle in the test for infringement has been cleared. The race is not over; it has only started. To allow literality to satisfy the test for infringement would force the patent law to reward literary skill and not mechanical creativity. And since the law is to benefit the inventor's genius and not the scrivener's talents, *claims must not only read literally on the accused structures, but also the structures must 'do the same work, in substantially the same way, and accomplish substantially the same result.'* *Dominion Magnesium Ltd. v. United States*, 162 Ct.Cl. 240, 252, 320 F.2d 388, 396, 138 USPQ 306, 312

(1963). This approach of making literal overlap only a step and not the entire test of infringement has been consistently applied by the courts since *Westinghouse v. Boyden Power Brake Co.*, 170 U.S. 537 [18 S.Ct. 707, 42 L.Ed.2d 1136] (1898), where Justice Brown stated at 568 [18 S.Ct. at 722:

The patentee may bring the defendant within the letter of his claims, but if the latter has so far changed the principle of the device that the claims of the patent, literally construed, have ceased to represent his actual invention, he is as little subject to be adjudged an infringer as one who has violated the letter of a statute has to be convicted, when he has done nothing in a conflict with its spirit and intent. [Footnote omitted] [Emphasis supplied].

■ A claim shall read on a device only if each element delineated in the claim is employed in the accused structure. The absence of a single claimed element precludes infringement. *Teledyne McCormick Selp v. United States*, 214 Ct.Cl. 672, 558 F.2d 1000, 195 U.S.P.Q. 261 (1977). Similarly, a method claim reads upon a process only if each step of the claimed method is utilized during the accused process.

■ Plaintiff has alleged that the United States used his patented measuring machines and associated methods. The Government is liable only for direct infringement of a patent. *Decca Ltd. v. United States*, 225 Ct.Cl. 326, 335, 640 F.2d 1156, 1177, 209 U.S.P.Q. 52, 60 (1980), *cert. denied*, 454 U.S. 819, 102 S.Ct. 99, 70 L.Ed.2d 89 (1981). Therefore, it is incumbent upon plaintiff to adduce evidence that the Government actually used the accused devices in an infringing manner, or practiced the precise methods claimed. Merely proffering evidence that the measuring devices procured by the Government might be operatively assembled in an infringing mode, or that the machines are capable of executing the claimed methods, does *not* prove infringement.

Moreover, plaintiff has the burden of establishing a *prima facie* case of infringement for each of the three claims in suit. *General Electric Co. v. United States,* 215 Ct.Cl. 636, 705, 572 F.2d 745, 783–84, 198 USPQ 65, 97 (1978); *see Strumskis v. United States,* 200 Ct.Cl. 668, 676–77, 474 F.2d 623, 628, 175 U.S.P.Q. 243, 246, *cert. denied,* 414 U.S. 1067, 94 S.Ct. 576, 38 L.Ed.2d 472 (1967). Plaintiff must satisfy this burden by a preponderance of the evidence. *Roberts Dairy Co. v. United States,* 208 Ct.Cl. 830, 851, 530 F.2d 1342, 1357 (1976).

Defendants' motions to dismiss assert that plaintiff has not proffered a *prima facie* case, i.e. that the Government used the measuring devices and the exact methods covered by plaintiff's three patent claims in suit.

The fundamental requisites of a *prima facie* case are, first, to establish that the Government actually used the accused devices and employed those devices to practice the claimed methods; and second, to demonstrate that the accused devices and the Government's operation thereof infringe the patent claims in suit. There are, of course, additional requisites of a *prima facie* case. However, for purposes of disposing of this motion to dismiss, only the evidence establishing the structure of the devices used by the Government, the operation of those machines, and the evidence which purports to establish infringement have been considered.

## VII. *Evidentiary Rulings*

Before the sufficiency of plaintiff's case can be considered, it is necessary to determine what evidence is admissible. Although a majority of the evidence was admitted during trial, plaintiff now seeks to move into evidence portions of the testimony which were deemed inadmissible during trial, but were preserved for the record under an offer of proof pursuant to Fed.R. Evid. 103(b).

During the trial, plaintiff, by way of offers of proof, proffered testimony from certain of his witnesses concerning the structure or actual operation of the accused devices. Each offer of proof arose from a series of objections raised by defendants regarding the relevancy, foundation, and hearsay of the testimony then being proffered by plaintiff. The court sustained each of the objections, ruled the testimony inadmissible, and permitted plaintiff to present the testimony for the record only under an offer of proof.[10]

In this case, each of the offers of proof were made under the stipulation that the plaintiff submit supporting memoranda controverting the objections to the evidence which had been sustained by the court. Before plaintiff can propound findings of fact which rely on excluded evidence, he must persuade the court to admit the excluded testimony.

■ Plaintiff's arguments as to why such evidence should have been deemed admissible address only the relevance of the excluded evidence. Plaintiff did not directly address, *nor refute* the sustained objections regarding hearsay and foundation defects. Simply refuting one of the three bases on which the evidence was excluded does not resolve all three objections. Therefore, without going to the merits of plaintiff's arguments on the relevance of the excluded evidence, the evidence shall remain excluded as being hearsay and for plaintiff's failure to lay a proper foundation.

A similar evidentiary matter, raised during trial, was the restricted admission of the operating manual for the accused Cordax 5000, a coordinate measuring machine manufactured by third-party defendant, Bendix. The manual (plaintiff's proposed exhibit 125) was admitted under the following restrictions:

> THE COURT: First, the exhibit may be relied upon only to prove potential methods of operation of the accused

10. Pursuant to Fed.R.Evid. 103(b), the court may permit a party, under an offer of proof, to present testimony which has been excluded from trial. An offer of proof does not place the testimony into evidence, but rather merely permits the testimony to be preserved on the record should the judge rule the testimony admissible at a later date.

equipment to which it relates; the exhibit may not be relied upon to prove that the accused equipment was, in fact, operated in accordance with the methods set forth in the manual except with the corroborating testimony of a witness or some other form of corroborating evidence.

Second, the exhibit may not be relied upon to prove the structure of the accused devices to which it relates except with corroborating testimony or other evidence specifically tying the contents of the exhibit relating to structure to the device accused of infringement.

Plaintiff now contends that the Cordax 5000 operating manual should not have been placed under a restrictive admission, but rather that the manual should be admitted without restriction. Moreover, plaintiff has propounded findings of fact regarding the modes in which the Government operated the Cordax 5000, based on the manual. Such reliance is *ipse dixit* and impermissible. The Cordax 5000 manual discloses a wide variety of modes in which the Cordax 5000 is capable of operating. Many of the modes, such as operation directly under human control, clearly do *not* infringe any of the claims in suit, since all of the claims in question are directed to an *automatic* measuring machine. Therefore, the Cordax manual, by itself, is inadequate to support a finding that the Cordax 5000 was necessarily operated in an infringing manner.

Moreover, the Cordax 5000 manual is a general service manual for at least three different models of Cordax coordinate measuring machines. The court notes that in the manual, much of the text, illustrations, and electrical schematic diagrams, refer to *all* Cordax coordinate measuring machine models. Whether the Cordax 5000 incorporates each of the components, in the same manner as disclosed in the service manual, is uncertain. Additionally, the Cordax manual ostensibly does not include a complete blueprint of the Cordax 5000. Rather, the manual overflows with descriptions and illustrations of specific components of the machines. While such *discrete* disclosures may aid a Cordax 5000 serviceman, they do not assist this court as it attempts to discern the exact structure *and* exact operation of the accused measuring machine.

■ Therefore, the manual is still restrictively admitted and, without corroborating evidence which demonstrates the operational methods actually employed by the Government, or which establishes the structure of the Cordax 5000 procured by the Government, the service manual for the Cordax 5000 shall not be solely relied upon to adduce the operation or structure of the accused device.

## VIII. *The Accused Devices*

During trial, plaintiff proffered evidence relating to six coordinate measuring machines. Those coordinate measuring machines are: (1 & 2) the DEA IOTA 2204 P and 1205 DNC coordinate measuring machines located at the Army's Chrysler Tank Plant, Detroit, Michigan; (3) the Validator 200 DCC coordinate measuring machine, manufactured by third-party defendant, Brown & Sharpe, and located at the David Taylor Model Basin, Washington, D.C.; (4) the Validator 300 coordinate measuring machine, manufactured by Brown & Sharpe, and located at the Army's Chrysler Tank Plant; (5) the Cordax 803 DCC coordinate measuring machine, manufactured by third-party defendant, Bendix, and located at Bendix's Kansas City facility; (6) the Cordax 5000 DCC, manufactured by Bendix and located at the Lockheed facility in Sunnyvalle, California.

Each of the accused coordinate measuring machines are extremely accurate measuring instruments generally found only in quality control labs or other sites where precise measurements are routinely conducted. The asserted accuracy of the accused devices is greater than one thousandth of an inch. The accused devices have been employed to inspect heat tiles for the space shuttle; to inspect housings for the drive train on Army tanks; and in sundry other related measurements.

A coordinate measuring machine, similar to those in suit, is illustrated below.

The worktable of each of the accused devices provides a sturdy foundation on which is placed the workpiece to be measured. Positioned over the worktable is the probe. The probe is sensitive to touch and, as such, is able to sense the surfaces of workpieces.[11] The probe is sheathed within a probe shaft; the probe shaft is supported by a bridge; and the bridge is suspended by two struts.[12]

11. Ostensibly, the accused machines, at times, employ "numb" probes, insensitive to touch. However, for purposes of ascertaining liability, the accused devices were considered only with touch sensitive probes.

12. The DEA 1205 and 2204; the Brown & Sharpe 200 and 300; and the Cordax 300 incorporate a bridge overhanging the work table. The Cordax 800 and 5000, however, do not employ a bridge, but rather support their probe shafts via a cantilever beam. See the figure below.

The probe may be maneuvered to any position on or above the worktable. The probe derives its mobility from the moveable struts, bridge, and probe shaft. The struts traverse the length of the worktable and, thus, provide the probe with longitudinal movement. A track on the bridge allows the probe shaft to slide back and forth across the bridge to provide the probe with lateral movement. The probe travels up-and-down within the probe shaft for vertical mobility. Through the proper combination of its longitudinal, lateral, and vertical mobility, the probe may be maneuvered along any chosen path or to any desired point within its reach.

The movements of the struts, probe shaft, and probe are motorized. Consequently, locomotion for the probe is self-contained within the coordinate measuring machine. Moreover, the movements of the struts, probe shaft, and probe are metered. The coordinate measuring machines ascertain the exact position of the probe by monitoring and measuring the movements of the struts, probe shaft, and probe.

Command of the probe and its movement is provided by a computer controller, which is interfaced with the probe, the probe shaft, and the struts. The computer controller maneuvers the probe by directing the movements of the struts along the worktable, the probe shaft across the bridge, and the probe up-and-down within the probe shaft. The computer can be programmed to monitor the position of the probe and record any of those positions, especially those positions at which the probe encounters the workpiece.

The computer does not independently select the probe's path or its next position. Rather, the computer merely executes the instructions of the operator. Those directions are imparted to the computer either directly and immediately by a technician, controlling the probe's movement through an electronic "joy-stick", or indirectly by means of a computer program containing instructions as to the probe's path and its itinerary of preselected positions.

In both bridge and cantilever-beam coordinate measuring machines, the machine

The beam is similar to the bridge in that it overhangs the worktable; it is supported by a mobile strut which travels the length of the worktable; and it provides a track on which the probe shaft rides. Thus, for purposes of determining infringement, a cantilever-beam is indistinguishable from a bridge.

operator pilots the probe within the space immediately above the worktable. Generally, the operator maneuvers the probe manually, via a pair of "joy stick" controls. Since the workpiece is placed onto the worktable within reach of the probe, a skillful operator can navigate the probe to any point on the surface of the workpiece. Because the probe on an accused coordinate measuring machine is sensitive to touch, whenever the probe tip encounters the workpiece, a signal is transmitted to the machine's computer controller. The signal causes the computer to record the current position of the probe.

In addition to the accused instrument's ability to continually ascertain the position of the probe, the devices are *advertised* as having the capability to automatically maneuver the probe to a series of predetermined positions.[13] To do so, the computer associated with the coordinate measuring machine is initially programmed with the coordinates of those preselected positions. Subsequently, the computer directs the movement of the probe to the preselected positions to execute the previously recorded instructions.

Plaintiff's '042 patent discloses a measuring device which operates similarly to the accused coordinate measuring machines in several respects. Plaintiff's device is illustrated in figure 3 of the '042 patent, shown below.

FIG. 3

In figure 3, the sensing head 30 employs a touch sensitive probe (44) affixed to a mobile base (41). Base 41 is able to longitudinally traverse the second base plate (39). Moreover, second base plate 39 moves laterally across the face of the first base plate (31). Thus, surface-sensing head 30 enables probe 44 to maneuver laterally and longitudinally to any point on the face of base plate 31. The operation of the sensing head 30 is described in the '042 patent as follows:

Fig. 3 illustrates a probe mount and assembly 30 designed to permit a probe or surface sensing transducer 44 to be laterally and longitudinally positioned relative to an article of manufacture or assembly

---

13. Merely proffering advertisements that the accused devices are able to infringe the method claims is insufficient to adduce a *prima facie* case that the Government actually used the devices in that specific infringing manner. The accused coordinate measuring machines do not infringe any of the claims in suit when operated manually via "joy sticks." Because the accused devices are advertised as operable, either, manually or automatically, pursuant to full computer control, plaintiff must proffer evidence that the defendant operated the accused devices under full computer control in order to prove infringement.

whereafter longitudinal movement of said probe will permit it to be positioned throughout a substantially infinite number of locations within a given volume. In other words, many different surfaces of a workpiece or assembly may be sensed once the probe mount 36 is prepositioned adjacent to said work. A manipulation apparatus 11 is shown as having a first arm 11A pivotally supporting a second arm 11B which is secured to the rear face of a plate 31 which is either angularly adjustable relative to the arm 11A by manual or automatic means for positioning the assembly 30 relative to a workpiece or conveyor thereof. [Line 67, column 3 through line 6, column 4, of the '042 patent].[14]

Surface-sensing probe mount and assembly 30 disclosed in the '042 patent, is similar to the accused coordinate measuring machines in that the probe mount is capable of maneuvering the sensing probe to any point within the perimeter of base plate 31, much the same as the accused devices maneuver their probes to any position within the perimeter of their worktables. Although surface-sensing probe mount 30 has only two degrees of freedom, i.e. laterally and longitudinally, in contrast to the accused devices which maneuver their probes through three degrees of freedom, i.e. longitudinally, laterally, and vertically, the probe mount 30 is the only device disclosed in the '042 patent, that is analogous to the accused instruments.

Probe 44 and mount 30 of the '042, patent, however, are not separately claimed in the '042 patent. The probe and mount are a "means for sensing a surface to be measured," as stated in claim 1. The surface-sensing means is only one element of many delineated in claim 1. Claim 1 is not infringed unless each element claimed is incorporated in the accused device. *Teledyne McCormick Selph v. United States,* 214 Ct.Cl. 672, 686, 558 F.2d 1000, 1007–08, 195 U.S.P.Q. 261, 267 (1977).

A manipulation means is also an element of the invention of claim 1. The manipulation means (11, figures 3 and 4 of the '042 patent) pre-positions probe mount 30 adjacent to the workpiece being measured. The purpose of the manipulation means is to bring the sensing means within reach of the workpiece. On the accused devices, however, the workpieces are placed manually onto the worktable, within reach of the probe.[15] Therefore, a manipulation means is both unnecessary and absent on the accused coordinate measuring machines.

Accordingly, the accused coordinate measuring machines do not comprise a manipulation means, as delineated in claim 1 of the '042 patent. Therefore claim 1 of the '042 patent is not infringed by the accused devices.[16]

### IX. *The Accused Methods*

Claim 12 of the '635 patent and claim 15 of the '833 patent each prescribe a method to automatically measure dimensions. Each method accused of infringement relates to

14. While the above-cited caption from the '042 patent discloses that the manipulation means may be operated either manually or automatically, the invention claimed in claim 1 calls for *automatically* operating the manipulation means by virtue of the program control means. Therefore, the claimed invention is limited to automatic manipulation means, and excludes manually operated manipulation means.

15. Plaintiff asserts that the probe shaft on each of the accused devices corresponds to the manipulation means listed in claim 1 of the '042 patent. However, this court finds otherwise for the following reasons: (1) the probe shaft does not pre-position the probe, but rather, moves the probe vertically *during* the measurement; (2) the vertical movements of the probe

shaft are metered, as contrasted to the claimed invention's manipulation means which simply follows a predetermined path; and (3) the probe shaft is similar to inspection probe assembly 15, but is dissimilar to each of the manipulation means disclosed in the '042 patent.

16. The patent in suit also discloses a movable worktable which automatically pre-positions the workpiece, rather than automatically pre-positioning the probe. However, no evidence was presented demonstrating that the workpiece was *automatically* pre-positioned relative to the accused devices, by a mobile worktable; thus, automatic pre-positioning of the workpiece as used in claim 15 was not adduced.

the operation of the accused coordinate measuring machines hereinabove discussed.

 Each accused method is comparable to the others in at least two respects, in that: (1) the workpiece to be measured is manually pre-positioned onto the worktable; and (2) the information displayed by the accused coordinate measuring machines after completing a measurement is not indicative of the distance traveled by their probes. These similarities distinguish the accused methods from both of the method claims in suit. Therefore, for reasons more fully explained hereinafter, neither claim 12 of the '635 patent nor claim 15 of the '833 patent is infringed by any of the accused methods.

Claim 15 of the '833 patent is directed to "a method of automatically measuring dimensions between surfaces of a workpiece * * *." The initial step in claim 15 is "relatively pre-positioning a workpiece and an automatic measurement device." This court has construed the initial step as necessarily being automatic. Consequently, any method of measuring dimensions, in which the pre-positioning of the workpiece and the measuring device is achieved manually, will not infringe claim 15. *See Teledyne McCormick Selph v. United States,* 214 Ct.Cl. 672, 686, 558 F.2d 1000, 1007–08, 195 U.S.P.Q. 261, 267 (1977).

Each of the accused devices incorporates a worktable on which the workpiece is positioned during the measurement.[17] In each accused method, the workpiece is manually placed onto the worktable.[18] Once the workpiece is positioned onto the worktable, the workpiece and the coordinate measuring machine are relatively pre-positioned within the meaning of step 1 of claim 15. However, because the pre-positioning step in each of the accused methods is executed manually, those methods do not infringe claim 15 of the '833 patent.

Claim 12 of the '635 patent prescribes "a method for *automatically* measuring dimensions." (Emphasis supplied). The claimed method is executed on devices such as that in figure 1 of the '635 patent depicted below.

**17.** The '833 patent also describes the pre-positioning step as being implemented by means of an *automatically* maneuverable worktable, such as a conveyor belt. However, the worktables in all of the accused devices remain stationary. A stationary worktable does not constitute an automatic pre-positioning means, as set forth in step 1 of claim 15.

**18.** The drive train housings are hoisted onto the worktable of the DEA 2204 via a crane directed by an operator. The record is devoid of any indication that the crane was automatically controlled. Thus, the crane does not constitute automatic pre-positioning of the workpiece.

FIG.1

The measurement method defined in claim 12 begins with sensing head 31 being aligned with the workpiece *W,* such that the probe straddles the workpiece, and the jaw (32) abutts against a side of workpiece *W.* Next, the opposing jaw (33) is advanced until it also engages workpiece *W.* Jaw 33 advances along a straight line, aligned with the dimension (D) being measured. The distance traveled by opposing jaw 33 is recorded by means of a train of electronic pulse signals generated during the probe's advance. The distance remaining between the jaws is the measured dimension of the workpiece, and is calculated from the distance traveled by opposing jaw 33.

Crucial to the understanding of method claim 12 is that the distance traveled by jaw 33 is actually being measured, and from that measurement, dimension D of workpiece *W* is calculated. Claim 12 specifically incorporates this concept: "applying said digital information to activate a visual presentation means to visually *indicate the distance travelled by said probe* in intelligible form." (Emphasis supplied). Thus, an infringing method must visually indicate the distance traveled by its probe.[19]

The accused methods do not measure the distance traveled by probes of the coordinate measuring machines. Rather, each records a probe's coordinates at the instance the probe contacts the workpiece.[20] These

19. The distance traveled by the probe is only measured after it has been aligned with the workpiece. The distance traveled by the probe while being aligned with the workpiece is not measured.

20. Each of the coordinate measuring machines in suit employs a three-dimensional coordinate

coordinates correspond to the points on the workpiece touched by the probe. Knowing the coordinates of various points on the workpiece enable the accused instruments to calculate the dimensions of the workpiece.

Because the distances traveled by the probes of the accused devices are *not* measured, the probes can follow any path between the points on a workpiece. Thus, the probes of a coordinate measuring machine need not follow the straight line coaxial to the dimension being measured; however, a probe executing claim 12 must follow such a line. Since the probes of the accused coordinated measuring machines are not required to follow a straight line, and since the distance traveled by the probe is not measured, any dimension displayed by an accused method is not indicative of the distance traveled by the probe.

Moreover, since the accused methods do not visually indicate the distance traveled by the probe, as delineated in claim 12, these methods do not infringe claim 12.

## X. CONCLUSION

For the reasons set forth hereinabove, this court finds that: (1) because the accused coordinate measuring machines do not incorporate a manipulation means, they do not infringe claim 1 of the '042 patent; (2) because the accused methods do not automatically pre-position the sensing means relative to the workpiece, these methods do not infringe claim 15 of the '833 patent; and, (3) because the accused methods do not visually indicate the distance traveled by the probe, these methods do not infringe claim 12 of the '635 patent. Therefore, each of the claims of the three patents asserted are not infringed, and plaintiff's complaint is to be dismissed.

IT IS SO ORDERED.

ment of the probe shaft across the bridge; and the movement of the probe up and down within the probe shaft. To index any one point, the coordinate measuring machine establishes that position relative to each of the three coordinate axes. Once that position is established relative to the coordinate axes, the coordinates of the point are known.

The coordinate system is not a physical entity, but rather, is an imaginary three-dimensional grid system created by the computer of the measuring device. Using the coordinate system, a coordinate measuring machine is able to index any point within reach of the probe. Moreover, because the coordinate measuring machines continually monitor the positions of their probes, every location traveled by the probe can be recorded into the memory of the computer. In this manner, the path followed by the probe, or any specific point along that path, can be recorded.

system to continually monitor the position of the probe. The coordinate system is analogous to the grid coordinate system superimposed onto most travel maps. A traveler using such a map, references any position on the map by ascertaining the coordinates of that location from the map index. The coordinates presented in the index are the row and column of the desired point; e.g., D–4 might indicate Washington, D.C. on a map depicting the East Coast of the United States. Similarly, the accused coordinate measuring machines reference a point via its coordinates. However, while there are only two coordinate directions on a map, i.e. north to south and east to west, the probe's position is measured against three coordinate axes, e.g.: (1) laterally, across the worktable; (2) longitudinally, along the worktable; and (3) vertically, above the worktable. These three axes correspond to the movement of the struts along the length of the worktable; the move-