**INTERTECH LICENSING
CORPORATION,
Plaintiff,**

v.

**BROWN & SHARPE MANUFACTUR-
ING COMPANY, INC., Defendant.**

**Civ. A. No. 83–220–JLL.**

United States District Court,
D. Delaware.

March 8, 1989.

Jeffrey M. Weiner, Wilmington, Del., and Ronald R. Snider, Washington, D.C., of counsel, for plaintiff.

Allen M. Terrell, Jr. and David Johnson–Glebe of Richards, Layton & Finger, Wilmington, Del., and David Wolf, James J. Foster, and Ted Naccarella of Wolf, Greenfield & Sacks, P.C., Boston, Mass., of counsel, for defendant.

## OPINION

LATCHUM, Senior District Judge.

This patent infringement action involving U.S. Patent No. 3,226,833 ("the '833 patent") has an unusual history. It is remarkable because of the long delays surrounding its enforcement against the defendant and because plaintiff's legal position has materially shifted over the years.

Defendant Brown & Sharpe Manufacturing Company, Inc. ("Brown & Sharpe"), throughout the life of this litigation, has asserted the equitable doctrine of laches as a bar to this infringement action. (Docket Item ["D.I."] 39; D.I. 68.)

Following initial legal maneuvering by the parties, explained later, the Court, pursuant to Rule 42(b), Fed.R.Civ.P., tried, without a jury, the separate issue of laches on December 5, 1988. After considering the sufficiency and weight of the evidence adduced at trial, the demeanor of the witnesses who testified, and the post-trial memoranda filed by the parties, the Court enters the following findings of fact and conclusions of law embodied within this Opinion, as permitted by Rule 52(a), Fed.R. Civ.P.

## I. FACTS

On January 4, 1966, the United States Patent Office issued the '833 patent to Jerome H. Lemelson. (D.I. 1, Ex.) The '833 patent, which is entitled "Automatic Inspection Apparatus and Method," embodies 20 claims. (Id.)

Lemelson granted an exclusive license in the '833 patent to plaintiff Intertech Licensing Corporation ("Intertech") on July 1, 1981. (See D.I. 50, Ex. A.) The transaction appears to have been tax-driven, because Intertech conducts no business other than enforcing and negotiating sublicenses on the '833 patent and other Lemelson patents. (D.I. 50 at ¶¶ 3A & B.) Throughout this Opinion, Intertech, Lemelson, and various other agents and attorneys retained by Lemelson will be referred to collectively as Lemelson, unless otherwise specified.[1]

Defendant Brown & Sharpe manufactures and sells an array of industrial products including machine tools and precision measuring equipment, such as coordinate measuring machines. (See Plaintiff's Exhibit ["PX"] 7.) Brown & Sharpe's coordinate measuring machines are highly accurate measuring instruments typically used in quality control labs where measurements of the utmost precision are required. See Lemelson v. United States, 3 Cl.Ct. 161, 181 (1983) (related litigation in which infringement of the same patent claim involved in this case was alleged), vacated in part, 752 F.2d 1538 (Fed.Cir.1985). The machines are capable of conducting a wide variety of measurements. 3 Cl.Ct. at 162. Brown & Sharpe's line of coordinate measuring machines, which is sold primarily under the "Validator" trademark, has included model numbers 50, 100, 200, and 300.

During the period from 1969 through 1973, Lemelson and Brown & Sharpe exchanged a cross fire of correspondence. Lemelson in some letters suggested, in a somewhat understated tone, that Brown & Sharpe's products might be infringing his patents. In other correspondence Lemel-

---

**1.** Indeed plaintiff's brief speaks of Intertech and Lemelson interchangeably. (See D.I. 88 at 1.) Moreover, by the terms of the July 1, 1981 licensing agreement, 95% of Intertech's net income is promptly paid over to Lemelson. (D.I. 50, Ex. A at 3.)

son expressly and unequivocally accused Brown & Sharpe of infringement and threatened litigation. The Lemelson correspondence and the procedural history of this case are set forth below in rather painstaking detail, in order to provide a flavor for Lemelson's dilatory and inconsistent conduct.

### A. *The 1969 Correspondence*

Plaintiff's initial contact with Brown & Sharpe was by letter dated March 12, 1969. The letter of March 12 called defendant's attention to the '833 patent, perhaps hinted that Brown & Sharpe products infringed the '833 patent, and solicited Brown & Sharpe to enter into licensing negotiations with Lemelson.[2]

Lemelson wrote Brown & Sharpe again on April 29, 1969:

Reference is made to your letter of March 24, 1969, ... concerning [the '833 patent]....

In your aforesaid letter you state that you do not believe that your Validator-100 is covered by the claims of [the '833 patent].

It will be appreciated if you particularly point out those limitations of the claims in [the '833 patent] that are not found in the Brown and Sharpe Validator-100.

(D.I. 37, Ex. D.)

Brown & Sharpe answered Lemelson with a letter dated May 9, 1969:

Replying to your letter of April 29, 1969 which deals with [the '833 patent] ..., we would restate our belief, contained in [our] letter of March 24, 1969

..., that our Validator-100 does not use the features covered by the patent.

\* \* \* \* \* \*

We enclose a copy of our Fact Sheet V-100 for your use.

(D.I. 37, Ex. E; PX 32; DX AY.) The Fact Sheet V-100 document mentioned in the May 9 letter describes Brown & Sharpe's Validator-100 machine. The document reads in part:

The Validator-100 is a 4-mode coordinate *and* diameter measuring machine. The optimum in mechanical and electronic characteristics have been incorporated in design to provide a resolution of 50-millionths of an inch for *measurements along three mutually perpendicular axes* (X, Y and Z), *and* for hole diameter measurements (D).

\* \* \* \* \* \*

The Validator-100 has a work size capacity of 36″ × 24″ × 18″ with a corresponding measuring capacity of 36″ (X), 24″ (Y) and 8″ (Z) *and* a hole diameter measuring capability of from .500″ to 2.400″.[3]

(D.I. 37, Ex. E [footnote and emphasis added].)

### B. *The 1970 Trade Show*

Following the 1969 correspondence, Lemelson's next brush with Brown & Sharpe occurred in September, 1970, at a trade show in Chicago sponsored by the National Machine Tool Builders Association. Brown & Sharpe maintained a booth at the trade show, at which some of its machines were exhibited. (D.I. 79 at 2.)

The testimony of Mr. Kurt Businger, taken by deposition for use at trial, describes

---

**2.** Although the March 12, 1969 letter is not in the record, neither party questions its existence. Brown & Sharpe's letter in response, dated March 24, 1969, is found in the record. It reads in part:

We have received your letter of March 12, 1969, in which you call to our attention [the '833 patent]....

We have known of the patent previously and of the features covered by the claims and do not believe that our Validator-100, which you mention specifically, uses the features. Also, we do not believe that we are interested

in acquiring rights under the patent, at this time.

(PX 31; Defendant's Exhibit ["DX"] A.)

**3.** This description of Brown & Sharpe's equipment, contained in a document which was furnished to Lemelson in 1969, is strongly suggestive of a machine capable of measuring the distance between points on two different surfaces of a workpiece. The relevance of this fact will become more apparent in the sections of this Opinion which follow. See especially Parts I.E. and III.B., and notes 22–23, *infra*.

the Brown & Sharpe display at the 1970 trade show.[4]

Q  Did Brown & Sharpe have a machine, a coordinate measuring machine on display at [the 1970 trade] show?

A  That's correct.

Q  And what type of probe [5] was on that coordinate measure machine at the tool show?

A  We called it the Universal Measuring Probe which is a ⅜ ball diameter type probe that made electrical contact with the work piece to automatically indicate to the computer when a measurement has to be taken.

Q  Is it correct to say that that probe ... senses contact with the work piece?

A  It makes contact with the work piece.

Q  And when it makes contact does it then send a signal back?  What does it do?

A  Then that closure of that circuit is ... analyzed by the computer and a measurement is taken at that particular time.

Q  Okay.  And the machine that was on display at the tool show, was it capable of measuring the distance between two points on a work piece?

A  It was capable of measuring the distance between two points.  It was capable of measuring a hole size and the location of the holes.

\*    \*    \*    \*    \*    \*

Q  Now did you personally operate the machine at the tool show?

A  At certain times I did personally operate the machine at the tool show, that's correct.

Q  Was the machine operated at times to measure the distance between two points on a work piece?

A  That's correct.

(DX AZ at 13–14 [footnote added].)

Defendant's Exhibits N and O provide additional evidence of the attributes of Brown & Sharpe's equipment as displayed at the 1970 trade show.  Exhibit N, a brochure distributed at the trade show,[6] bears the following heading:  "BROWN & SHARPE COMPUTER CONTROLLED VALIDATOR 100 4–MODE MEASURING CENTER AS DEMONSTRATED AT THE 1970 N[ATIONAL] M[ACHINE] T[OOL] B[UILDERS] A[SSOCIATION] SHOW."  The brochure recites that the Validator 100 "system includes ... all interfacing required for *automatic computer control* [7] of Validator motions."  (DX N [emphasis and footnote added].)  Additionally, the brochure states that the equipment includes "[a] *new sensing probe* [which] permits ... measurement of coordinate locations...."  (*Id.* [emphasis added].)

Defendant's Exhibit O is an article which appeared in the September 7, 1970 issue of the periodical *American Machinist,* entitled "B & S Coordinate Measuring Unit Checks Diameter, Center Distance Simultaneously."[8]  The article reads in part:

The Validator–100 *computer-controlled measuring machine* inspects diameters ..., center distances, *and regular coordinate dimensions of a workpiece* simultaneously.

The machine *uses a universal ball probe* to do its work.

(DX O [emphasis added].)  Mr. Businger testified that the reference to a "universal ball probe" indicates a probe which touches

---

**4.**  Mr. Businger held the title of Assistant Director of Design at Brown & Sharpe at the time of the 1970 trade show.  (DX AZ at 1.)  He has not been affiliated with the company since 1973. (*Id.*)

**5.**  An issue in determining whether plaintiff's infringement action is barred by laches, is the question of when Brown & Sharpe's measuring machines first utilized "touch sensitive probes." *See* Parts I.E. and III.B. of this Opinion and note 20, *infra.*

**6.**  (*See* D.I. 89 at 8–9, 20.)

**7.**  The significance of when Brown & Sharpe's machines first operated under "automatic computer control" or "direct computer control," is discussed below.  *See* Part I.E. of this Opinion and note 21, *infra.*

**8.**  The September 7, 1970 issue is the "Chicago Show Issue."  (DX O.)  The article about Brown & Sharpe's equipment is contained in a section of the issue describing quality control equipment.  (*Id.*)

the workpiece and completes a circuit (DX AZ at 17), i.e. a touch or surface sensing probe.

Mr. Lemelson attended the 1970 trade show. (D.I. 85 at 45.) A stated purpose for his attendance was to determine whether his patents were being infringed, and to identify any such infringers. (D.I. 85 at 46–47.) Mr. Lemelson visited the Brown & Sharpe booth at the trade show. (D.I. 85 at 45; DX AZ at 7.)

Mr. Businger recalls demonstrating the Brown & Sharpe equipment for Mr. Lemelson, at which point Mr. Lemelson expressly accused Brown & Sharpe of infringement. According to Mr. Businger:

> [Lemelson] came up to me. I was demonstrating the machine. He asked me lots of questions. I showed him how it works and the whole thing. All of a sudden he ... pull[ed] out some patents and said that ... we are infringing on his patents.
>
> *   *   *   *   *   *
>
> After I demonstrated the machine to him and explained to him how these different features of the machine worked, he then pulled out of his pocket some patent. I don't know how many there were, and he told me that we, Brown & Sharpe, are infringing on his patents.... Mr. Lemelson then explained ... that *Brown & Sharpe is infringing on his patents of computerized measuring machine[s].*

(DX AZ at 7–8, 20 [emphasis added].)

Mr. Lemelson's recollection of his encounter with Brown & Sharpe at the 1970 trade show is somewhat less vivid. "The only recollection that I have of the Tool Show is that Brown & Sharpe exhibited a number of their machines, they were coordinate measuring machines.... [E]xactly how they operated, I don't recall." (D.I. 85 at 45 [trial testimony of Mr. Lemelson].) When asked whether he remembered, one way or the other, whether Brown & Sharpe had a sensing probe on their machine at the trade show, Mr. Lemelson responded: *"I am sure they had a probe, a sensing probe,* which forms part of coordinate measuring machines. Just how it was used or how it operated, I have no recollection." (*Id.* at 46 [emphasis added].) Lemelson also testified that it was his practice, when visiting a booth at a trade show, to watch a demonstration of the operation of a machine, and to pick up and peruse any literature describing the machine. (D.I. 85 at 56.)

### C. *1970 to 1973 Correspondence*

Following the 1970 trade show, Lemelson and his representatives directed a long series of correspondence to Brown & Sharpe, forcefully accusing the latter of infringing Lemelson's patents. This series of communications, with accusations by Lemelson and denials of infringement by Brown & Sharpe, continued until 1973.

The first noteworthy letter, dated November 6, 1970, was written by Lemelson's attorney and sent to Brown & Sharpe. It includes the following passage:

> From a study of your Fact Sheet V–100 [9] it appears that the construction and operation of the Validator 100 come within the purview of Claims 1 and 15,[10] respectively, of the ['833] patent.

(PX 34; DX C [footnotes added].)

Two weeks later, on November 20, 1970, Lemelson again wrote to Brown & Sharpe.

> I have discussed your letter [of November 16, 1970] with Mr. Berliner [Lemelson's patent attorney] and we are a bit puzzled by the arguments you present with respect to your inspection machines such as the Validator [11] and

---

9. Lemelson had been supplied with a copy of the Fact Sheet V–100 in 1969. *See supra* note 3 and accompanying text.

10. Claim 15 is particularly relevant because it is the only remaining claim, of the 20 claims within the '833 patent, upon which plaintiff continues to rely in alleging infringement in this action.

11. Interestingly, Lemelson refers in this letter to Brown & Sharpe's Validator line of inspection machines in general terms, apparently perceiving no need to differentiate between the various Validator model numbers.

claims 1 and 15 of [the '833 patent]. The fact that your machines employ a single point probe or hold the work stationery [sic] during measurement is irrelevant to the claims of the patents. *Claims 1 and 15 are not limited to any particular type of probe* nor do they define how the work is held during measurement.

(PX 36; DX D [emphasis and footnote added].)

Shortly thereafter Lemelson wrote still another letter to Brown & Sharpe. In a December 2, 1970 letter, Lemelson states: "In the event that your company is not interested in [a licensing] arrangement, we must resolve the matter of my patent rights." (PX 37; DX F.) Brown & Sharpe answered Lemelson's correspondence with a letter of its own, dated December 8, 1970, which began with the following sentence: "We refer to past correspondence and telephone discussions, wherein it was alleged that our Validator–100 Coordinate Measuring Machine may fall within the scope of certain claims of your ['833 patent]." (PX 38; DX E.) Brown & Sharpe then proceeded to deny, once again, that its equipment infringed Lemelson's patent. (*Id.*)

Lemelson's next clash with Brown & Sharpe occurred via a letter he mailed to defendant on July 20, 1971. That letter includes the following language:

It is some time since you have heard from me but the subject matter of infringment [sic] of our various inspection machine patents by your Validator 100 Coordinate Measuring Machine is not dead.

I cannot accept the general decision by you and your management that your "machine does not fall within the purview of the patent". As I indicated to you in my last telephone conversation *claims 15–18 of [the '833 patent] do not call for or require computer controlled operation of the measuring machine.* Furthermore, ... the *computer controlled coordinate measuring machine you offered at the Chicago Machine Tool Show last year* also did come within

certain of the claims of [my] other patents. . . .

\*    \*    \*    \*    \*    \*

I would like to inform you that I am seriously considering an offer made by a licensing organization in Chicago to have me assign these patents in turn for their efforts to obtain licenses from organizations such as yours. If I do this, I cannot predict how they will go about licensing my patents but I would assume that *they will resort to litigation if necessary.*

(PX 39; DX G [emphasis added].)

Lemelson sent yet another letter to Brown & Sharpe on September 9, 1971. His accusations of infringement and threats of litigation took the following form:

[Y]ou have never made a effort [sic] to indicate why claims 15–18 of [the '833 patent] are not infringed.

*It is difficult for me to understand why claims 15–18 of [the '833 patent] are not infringed either by a manually positioned machine or an automatic tape controlled measuring machine.*

*I believe your company is, in fact, manufacturing an automatic tape controlled machine* and the continued insistence by you that it does not infringe certain of the claims of one or more of the Lemelson patents, is not at all understood by me.

\*    \*    \*    \*    \*    \*

[If this matter is not resolved], I will take the steps necessary to protect the rights granted to me under the United States Patent Laws.

(PX 41; DX H [emphasis added].)

On February 27, 1973, Lemelson's patent attorney (Arthur Fattibene) wrote a letter to Brown & Sharpe's patent attorney (Herbert B. Barlow, Jr.). According to Mr. Fattibene, "it is evident from the brochures and what has been seen at the Trade Shows that ... the Validator 100 indeed operates in a manner substantially disclosed in the ['833 patent]." (PX 48.) Mr. Fattibene also observed that "the parties will benefit much more through reasonable

negotiation rather than antagonistic litigation." (*Id.*)

On March 14, 1973, Mr. Fattibene again wrote to Brown & Sharpe's patent attorneys on Lemelson's behalf. The letter charges that Brown & Sharpe's refusal to consent to a meeting with Lemelson "can only be indicative and interpreted by Mr. Lemelson as a willful and intentional disregard of his patent rights." (PX 49.) The Fattibene letter continues: "Unless your client is willing to sit down and reasonably discuss this matter in a face to face meeting then you leave Mr. Lemelson with no other alternative but to pursue his rights as may be perscribed [sic] by law." (*Id.*)

Mr. Lemelson himself wrote one additional letter to Brown & Sharpe's patent attorneys in 1973. That letter, dated April 11, 1973, makes no direct reference to the '833 patent, or to any Brown & Sharpe equipment which might infringe it. (*See* PX 50.) Subsequent to the letter of April 11, 1973, the record reveals no further communications between Lemelson and Brown & Sharpe for over six years, until October of 1979.

From the foregoing stream of correspondence, as well as the skirmish which occurred at the 1970 trade show, several facts are readily apparent. First, it is evident that Brown & Sharpe began marketing coordinate measuring machines under computer control and having touch sensitive probes by 1970. It is equally apparent that Lemelson knew of such marketing efforts by no later than March of 1973, and probably by a much earlier date. Also, it is clear that Lemelson specifically accused the Brown & Sharpe equipment sold in the early 1970's of infringing claim 15 of the '833 patent—the very same claim which Lemelson now says is infringed only by Brown & Sharpe's equipment produced since 1976.

### D. *The Claims Court Litigation*

On September 14, 1979, Lemelson filed a patent infringement suit against the United States Government in the United States Court of Claims (the "Claims Court litigation").[12] Lemelson alleged that the Government had infringed his '833 patent and two other Lemelson patents, by using measuring machines produced by three different manufacturers, one of which was Brown & Sharpe. *See Lemelson v. United States*, 3 Cl.Ct. 161, 162 (1983). Lemelson accused the Government of patent infringement through its use of Brown & Sharpe's Validator 200 and Validator 300 models.[13] *Id.* Brown & Sharpe was given notice by the Government of the Claims Court litigation (PX 51; PX 63), and thereafter entered the case as a third-party defendant and actively participated in its defense. 3 Cl.Ct. at 163.

Meanwhile, prior to the resolution of the Claims Court litigation, Lemelson commenced the instant action directly against Brown & Sharpe by filing a complaint in this Court on April 20, 1983. (D.I. 1.)

Soon thereafter, on July 26, 1983, a motion in the Claims Court litigation by the defendant United States Government to dismiss the action against it was granted by the Claims Court. 3 Cl.Ct. at 162. The motion to dismiss had been made upon completion of the presentation of Lemelson's case-in-chief, pursuant to what is now U.S. Claims Court rule 41(b). *Id.* at 162 & n. 1. The Claims Court found that Lemelson failed to prove, by a preponderance of the evidence, that the Government had infringed any of Lemelson's patents (including the '833 patent) by its use of measuring

---

12. The United States Claims Court, created in 1982, has since succeeded the former trial division of the Court of Claims.

13. Although Lemelson did not sue the United States Government for infringement by use of the Validator 100 model, which had been demonstrated to Lemelson at the 1970 trade show, there is no indication that the United States in fact ever used the Validator 100 model so as to give rise to such a suit. The barrage of correspondence unleashed by Lemelson during the 1969 through 1973 period (which accused the Validator 100 of infringement), in combination with his filing of the Claims Court litigation (which alleged infringement by the Validator 200 and Validator 300 models), suggests that all three models—the Validator 100, 200, and 300—to the extent they infringed at all, infringed in a similar manner.

machines produced by the three manufacturers (including Brown & Sharpe). *Id.* at 162. Lemelson appealed the dismissal to the Court of Appeals for the Federal Circuit.

Before any decision was rendered by the Federal Circuit, Lemelson and Brown & Sharpe agreed to stay the instant action pending the outcome of the appeal of dismissal of the Claims Court litigation. (D.I. 13 [Stipulation and Order dated January 10, 1984].) The stipulation further provided that, to the extent the Claims Court's judgment of non-infringement was affirmed on appeal, Lemelson would dismiss any corresponding infringement claims against Brown & Sharpe in this action. (*Id.*)

Dismissal of the Claims Court litigation was affirmed in part and vacated in part by a decision of the Federal Circuit dated January 4, 1985. *See Lemelson v. United States*, 752 F.2d 1538, 1541 (Fed.Cir.1985). The Federal Circuit vacated the Claims Court's finding of non-infringement by the Government of claim 15 of the '833 patent,[14] and affirmed the finding of non-infringement of the other Lemelson patents. 752 F.2d at 1553. The Federal Circuit remanded for further proceedings relating to claim 15 of the '833 patent. Upon remand to the Claims Court, the dispute between Lemelson and the Government concerning infringement of the '833 patent was settled out of court. *See Lemelson v. United States*, 8 Cl.Ct. 789, 790 (1985).

### E. *History of this Case*

As indicated above, plaintiff commenced this action against Brown & Sharpe by filing a Complaint in this Court on April 20, 1983.[15] (*See* D.I. 1.) Since then, plaintiff's legal theory has repeatedly shifted. Lemelson has changed horses in midstream not just once but on several occasions.

In Count I of the original complaint, plaintiff broadly alleged that Brown & Sharpe "has, for a long time past and up to the date of its expiration, infringed one or more claims of [the '833 patent][16] by making, selling or using coordinate measuring machines and methods embodying the patented inventions." (D.I. 1 at ¶ 6 [footnote added].) Counts II and III of the Complaint contained similarly broad accusations of infringement by Brown & Sharpe of two other Lemelson patents.[17] The allegations of the original Complaint are consistent with Lemelson's broad accusations of infringement contained in his blitz of communications with Brown & Sharpe throughout the period from 1969 to 1973.[18]

Following the decision by the Federal Circuit on appeal from the Claims Court,[19] plaintiff modified its position by dismissing Counts II and III of the Complaint. (*See* D.I. 20.) Thus only Count I remained, which asserted infringement of the '833 patent. Infringement by Brown & Sharpe of the other Lemelson patents was no longer alleged. Moreover, the effect of the Federal Circuit's decision, in conjunction with the January 10, 1984 Stipulation by the parties in this action (D.I. 13), was to further narrow the scope of Lemelson's infringement claims leaving only claim 15 of the '833 patent still in issue. (*See* D.I. 69 at 4.) Plaintiff no longer alleged in-

---

**14.** The Federal Circuit found the Claims Court's conclusion, that claim 15 of the '833 patent can only be infringed if the workpiece is automatically prepositioned, to be clearly erroneous. 752 F.2d at 1551–52.

**15.** The '833 patent had previously expired on January 4, 1983, seventeen years after its issuance. 35 U.S.C. § 154. Plaintiff's Amended Complaint seeks damages for infringement which occurred prior to the patent's expiration. (*See* D.I. 67 at ¶ 6.)

**16.** The '833 patent includes 20 claims. (D.I. 1, Ex.)

**17.** The other Lemelson patents are U.S. Patent No. 3,481,042 and U.S. Patent No. 3,636,635. (D.I. 1 at ¶¶ 10, 14.) In the Claims Court litigation, Lemelson accused the United States Government of infringing these same patents. *See* 3 Cl.Ct. 161, 162.

**18.** *See* Parts I.A. through I.C. of this Opinion, *supra*, which recap the 1969 to 1973 correspondence, and the hullabaloo at the 1970 trade show.

**19.** Part I.D. of this Opinion, *supra*, highlights proceedings in the Claims Court and in the Federal Circuit connected with this action.

fringement of any of the other 19 claims which comprise the '833 patent.

On November 12, 1987, defendant Brown & Sharpe moved for summary judgment on the basis of laches. (D.I. 39.) Defendant's motion triggered another switch in plaintiff's legal stance. In what appears to have been an effort by Lemelson to avoid a finding of laches, plaintiff abruptly turned its attention to the question of whether Brown & Sharpe's measuring machines contained touch sensitive probes and operated under direct computer control.

Plaintiff, in opposition to Brown & Sharpe's summary judgment motion, argued for the first time that the only Brown & Sharpe equipment which infringed claim 15 of the '833 patent were those machines having touch sensitive probes [20] and operating under direct computer control,[21] and that such machines were only produced after 1976. In contrast to his previous position, Lemelson argued that the earlier Brown & Sharpe equipment—which had been the subject of the 1969 through 1973 correspondence—did not include such features as touch sensitive probes and direct computer control, did not infringe the '833 patent, and never commenced the running of the laches period.

Plaintiff's briefs in opposition to the summary judgment motion underscore its newly-found emphasis on touch sensitive probes and direct computer control. "[P]laintiff asserts only claim 15 of the '833 patent against equipment[ ] which ha[s] probes which detect a surface of a work piece and direct computer control...." (D.I. 49 at 2.) On the same page, plaintiff stated that the "[c]oordinate measuring machines which are accused are the type where a touch sensitive probe or surface

sensing probe is directed by direct computer control...." (*Id.* at 2 n. 1.)

Plaintiff's theme that the laches period could begin to run only upon the development by Brown & Sharpe of equipment having touch sensitive probes and direct computer control, was reiterated throughout its briefs in opposition to summary judgment:

> The [Claims Court litigation] went to trial on the basis of the computer control measuring machine with a touch sensitive probe. No consideration was ever given to earlier designs such as the Validator 100 without computer controlled measurement. Non computer controlled touch sensitive probe machines were not at issue in the [C]laims [C]ourt litigation and are not now.

(D.I. 49 at 4–5 [footnote omitted].)

> The mere designation of ... equipment as a Validator 100 does not tell whether it included computer controlled touch sensitive probe measurement capability *and hence* infringement of method claim 15 of the '833 patent.

(D.I. 49 at 5 [emphasis added].) Finally, in opposing summary judgment on the basis of laches, plaintiff asserted that:

> [M]achines known as Direct Computer Controlled with touch sensitive probes are not similar to machines which are computer controlled with hard probes which are not touch sensitive. If the equipment [is] not similar, there is a different cause of action, and laches does not begin.

(D.I. 62 at 4.)

Throughout the course of plaintiff's vehement opposition to defendant's summary

---

**20.** Touch sensitive probes, which are sometimes referred to as surface sensing or conductive probes (*see* D.I. 89 at 5 n. *), emit an electronic signal upon making contact with the workpiece to be measured. (D.I. 62 at 34; D.I. 77 at 2.) There are at least two methods by which touch sensitive probes sense a workpiece. Some touch sensitive probes send an electric current which flows through the workpiece and completes a circuit when contact is made. (D.I. 83 at 2–3.) Another variation of touch sensitive probes detect the surface of a workpiece by means of a light beam. 3 Cl.Ct. at 170–72.

Touch sensitive probes are to be distinguished from hard, or non-sensing, probes. The latter are either moved into position manually, or dropped into place via gravity. (D.I. 62 at 3.)

**21.** The significance of the direct computer control feature is less than clear, because it would appear that machines having touch sensitive probes necessarily operate under direct computer control. (*See* D.I. 62 at 2–4; D.I. 79 at 17.) Thus the direct computer control inquiry is subsumed within the touch sensitive probe inquiry.

**1432**

judgment motion, Count I of the original Complaint (which made no reference to touch sensitive probes or to direct computer control) technically remained in effect, having not been amended by plaintiff. Before the Court ruled on defendant's summary judgment motion, plaintiff finally amended its Complaint on April 25, 1988. The Complaint, as amended, now reads in pertinent part:

> Defendant has, since 1976 and up to expiration (January 4, 1983), willfuly [sic], infringed claim 15 of [the '833 patent] by making, selling or using *Direct Computer Controlled* coordinate measuring machines having *touch sensitive probes* and methods embodying the patented invention.

(D.I. 67 at ¶ 6 [emphasis added].)

Faced with the freshly disputed issue of when Brown & Sharpe's measuring machines first featured direct computer control and touch sensitive probes, the Court denied defendant's summary judgment motion (*see* D.I. 69; D.I. 70), but granted its request for an expedited trial on the laches issue. (*See* D.I. 77; D.I. 78.) In granting the request for an expedited trial on laches, the Court listed the following as questions to be resolved at the trial:

> (1) Did Brown & Sharpe at the 1970 Chicago Tool Trade Show by its machine displays, distributed brochures, or information disseminated by Brown & Sharpe's representatives indicate that it had developed, made or offered for sale Direct Computer Controlled coordinate measuring machines with touch or surface sensitive probes, or machines similar or equivalent thereto, which are now charged with infringement in the Amended Complaint?

> (2) Did Brown & Sharpe make a Direct Computer Controlled coordinate measuring machine with touch sensitive probes ..., that was sold in 1971 and should Lemelson have known of the existence of such a machine in 1971 or before?

(D.I. 77 at 4.)

Preparatory to the laches trial, plaintiff continued to point to the time of Brown & Sharpe's introduction of equipment having touch sensitive probes, as the crucial issue for resolution at the trial. In the pretrial stipulation, plaintiff's statement of issues of law included the following:

> 6. Is laches a defence [sic] when the machines accused by Lemelson in 1970–1973 are *different* from those accused in this litigation *because they did not include touch sensitive probes*?

(D.I. 79 at 7 [emphasis added].)

As previously stated, a bench trial on the laches issue was held on December 5, 1988. The Court, and needless to say, Brown & Sharpe, were led to believe that the viability of the laches defense in this case would turn upon the question of when defendant's measuring machines first featured touch sensitive probes and direct computer control. Plaintiff apparently had other ideas. Not to be pinned down to a specific legal theory, at trial the ever-elusive Mr. Lemelson devised and unveiled yet another argument against laches, which is summarized below.

Claim 15 of the '833 patent is a method claim: "A method of automatically measuring dimensions between surfaces of a workpiece...."[22] (D.I. 1, Ex.) At trial and in its post-trial brief, plaintiff argued for the first time that the Brown & Sharpe machines of the 1969 to 1973 era did not measure the distance between two surfaces

---

**22.** Claim 15 consists of the following steps:

> (1) relatively prepositioning a workpiece and an automatic measurement device;
> (2) detecting a first surface of said workpiece by means of surface positional indicating means [i.e. a probe];
> (3) thereafter relatively moving said surface positional indicating means [probe] and said workpiece and automatically generating signals indicative of the degree of said movement;
> (4) detecting a second surface of said workpiece with said surface position indicating means [probe] when said second surface is aligned therewith;
> (5) integrating the signals generated during the movement of said workpiece and said surface detecting means [probe] between said first and second surfaces; and
> (6) generating a further signal indicative of the distance between said first and second surfaces.

(D.I. 1, Ex.)

on a workpiece as required by claim 15.[23] (*See* D.I. 88 at 4, 6–14.) Thus, according to plaintiff, these older Brown & Sharpe machines did not infringe claim 15 and could not have begun the running of the laches period.[24] Plaintiff now says that only the later machines (i.e. those produced by Brown & Sharpe since 1976) practiced the method of claim 15 so as to trigger the laches period;[25] that infringement since 1976 was within six years prior to bringing an infringement action; and that laches therefore is not a valid defense in this action.

To summarize, plaintiff's position has shifted often and markedly throughout this action, obfuscating issues in the process. In correspondence during the years 1969 to 1973, Lemelson and his agents openly accused Brown & Sharpe of producing measuring machines at that time which infringed Lemelson's patents. Consistent with this early position, plaintiff's original Complaint broadly accused Brown & Sharpe of infringing one or more claims of the '833 patent, as well as one or more claims of two other patents. (D.I. 1 at ¶¶ 6, 10, 14.)

Subsequent to the Federal Circuit's review of the Claims Court decision, plaintiff modified its position and narrowed its allegations. At this point plaintiff dropped Counts II and III from the Complaint, leaving only the charges of infringing the '833 patent, but not the other two Lemelson patents. (*See* D.I. 20.) Furthermore, plaintiff restricted its charges of infringement to only claim 15 of the '833 patent, excluding any action based upon the other 19 claims encompassing the '833 patent.

In contesting Brown & Sharpe's summary judgment motion, plaintiff's next change of position was to invent the issue of when Brown & Sharpe first offered equipment having touch sensitive probes and direct computer control. In an about-face from its prior position, plaintiff argued that the Brown & Sharpe equipment of the early 1970's did not infringe Lemelson's '833 patent *because* it lacked direct computer control and touch sensitive probes.

In yet another reversal, plaintiff's position since the start of the laches trial has been that the early Brown & Sharpe machines did not infringe *because* they performed a measurement function which differed from the method of claim 15 of the '833 patent. Plaintiff appears to have discarded its previous theory that the early Brown & Sharpe machines did not infringe *because* they lacked direct computer control and touch sensitive probes.

Plaintiff has changed its colors all too often. Laches is an equitable doctrine. As a court of equity, this Court cannot countenance plaintiff's chameleon antics.

## II. THE LAW OF LACHES

The only time limitation on a patent infringement action is found in 35 U.S.C. § 286, which provides that one cannot recover damages for any infringement committed more than 6 years before the filing of a complaint. This limitation simply restricts the *extent* one can recover pre-filing damages; it does not bar an infringement suit altogether. No other limitation is placed *by statute* on the filing of an infringement action during a patent's 17-year term. However, for almost 100 years, American Courts have applied the equitable doctrine of laches to bar stale infringement actions. *See Leggett v. Standard Oil Co.,*

---

**23.** Plaintiff stresses one function which the Brown & Sharpe equipment displayed at the 1970 Trade Show did perform. Namely, the equipment could locate the center point of holes on workpieces and measure hole diameters. (*See* D.I. 88 at 7–14.) Plaintiff contends that such hole measurements do not employ the method contemplated by claim 15 of measuring the distance between two surfaces on a workpiece. (*Id.*) However plaintiff does not consider other functions which the earlier (i.e. 1969 to 1973) Brown & Sharpe machines were capable of performing.

**24.** Plaintiff's present position obviously stands in stark contrast to the 1969 through 1973 correspondence, in which Lemelson flatly accused the Brown & Sharpe measuring machines of infringing his patents, including claim 15 of the '833 patent. *See* Parts I.A. through I.C. of this Opinion, *supra.*

**25.** (*See* D.I. 67 at ¶ 6; D.I. 88 at 4.)

149 U.S. 287, 294, 13 S.Ct. 902, 904, 37 L.Ed. 737 (1893). The Federal Circuit has recognized and applied the doctrine of laches to bar unreasonable and inexcusable delay in asserting stale infringement claims. *Hottel Corp. v. Seaman, Inc.*, 833 F.2d 1570, 1572–73 (Fed.Cir.1987); *Leinoff v. Louis Milona & Sons, Inc.*, 726 F.2d 734 (Fed.Cir.1984).

The impact, scope and burden of proofs were succinctly outlined in the *Leinoff* case, as follows:

> The one asserting a laches defense normally must prove the unreasonableness of a delay in filing the suit. The unreasonableness of a delay, of course, depends on the particular circumstances of the case and is left as a matter to the trial court's discretion. Normal equity practice, however, considers the passage of time equivalent to a comparable statute of limitations presumptive of laches. Because of the 6–year limitation in [35 U.S.C.] section 286, therefore, *a 6–year delay is presumptively an unreasonable one for filing a patent infringement suit.*

> The fact that a case is brought more than 6 years after infringement is noticed is not, in itself, enough to preclude a recovery of pre-filing damages. The patent owner may have an adequate excuse for the delay. *The result of the presumption after 6 years shifts the burden,* however, *to the patent owner* now *to prove the existence and reasonableness of* such *an excuse.*

> *A delay exceeding 6 years is,* furthermore, *presumptively injurious to the infringer. The infringer does not need, in such a case, to produce any additional evidence of prejudice.* The patent owner, therefore, bears the additional burden of showing lack of injury to the infringer caused by the delay.

726 F.2d at 741–42 (citations omitted, emphasis added).

## III. ANALYSIS AND CONCLUSIONS

■ A *threshold* inquiry—and, as it turns out, the *crucial* inquiry—in this case involves determining the length of plaintiff's delay in filing suit. If the delay exceeds 6 years, then laches is presumed and plaintiff must prove both that the delay was justified, and that it did not prejudice defendant. *Leinoff v. Louis Milona & Sons, Inc.*, 726 F.2d at 741–42. Conversely, if the delay is less than 6 years there is a presumption against laches.

Determining the length of the delay naturally breaks down into two subissues. The Court must decide both: (1) when the period of delay started to run; and (2) when the delay ended. These two questions will be addressed in reverse order.

### A. *End of the Delay*

Obviously the delay ended no later than April 20, 1983, upon the filing of this action by plaintiff against Brown & Sharpe. (*See* D.I. 1.) However plaintiff has argued, and quite correctly so, that the laches period ended at an earlier date. (*See* D.I. 49 at 10–12.)

The instant action was commenced during the pendency of other litigation, filed in the Claims Court on September 14, 1979, in which the United States Government was accused of infringing the same Lemelson patent claim now asserted against Brown & Sharpe. Brown & Sharpe received notice of the Claims Court litigation by letter dated September 24, 1979 (PX 51; PX 63), and actively participated in the case as a third-party defendant. *See Lemelson v. United States*, 3 Cl.Ct. 161, 163 (1983). These facts indicate that Brown & Sharpe was informed of the other proceedings, and of Lemelson's intent to enforce his patent rights against Brown & Sharpe at the conclusion of the Claims Court litigation. Based upon these facts, the Court concludes that the period of plaintiff's delay ceased as of September, 1979.[26] *See*

---

**26.** The theoretically correct date for the end of the delay period is probably the date of defendant's *receipt* of notice of the other litigation, rather than the date such notice was sent (September 24, 1979) or the date such other litiga-

tion commenced (September 14, 1979). *See Watkins v. Northwestern Ohio Tractor Pullers Ass'n, Inc.*, 630 F.2d 1155, 1163 (6th Cir.1980). The record indicates that Brown & Sharpe received notice of the Claims Court litigation on

*Jamesbury Corp. v. Litton Indus. Products, Inc.,* 839 F.2d 1544, 1553 (Fed.Cir.), cert. denied, —— U.S. ——, 109 S.Ct. 80, 102 L.Ed.2d 57 (1988); *Hottel Corp. v. Seaman Corp.,* 833 F.2d 1570, 1573 (Fed.Cir. 1987).

## B. *Start of the Delay*

■ Having determined that the period of plaintiff's delay ended in September, 1979, the Court now considers the point in time when the delay period began. If the beginning date precedes September, 1979, by more than 6 years, then laches is presumed. *Leinoff v. Louis Milona & Sons, Inc.,* 726 F.2d at 741–42. The delay period began to run when the patentee knew, or with reasonable diligence should have known, of the allegedly infringing activity. *Jamesbury Corp. v. Litton Indus. Products, Inc.,* 839 F.2d at 1552.

As found in Part I.C. of this Opinion, *supra,* Brown & Sharpe has marketed coordinate measuring machines having direct computer control and touch sensitive probes since at least 1970. Moreover, Lemelson was certainly aware of Brown & Sharpe's marketing efforts by no later than March, 1973, and probably by several years before that, as revealed by the long line of correspondence already dissected in Parts I.A. and I.C. of this Opinion, *supra.* Finally, in that same correspondence Lemelson accused Brown & Sharpe of infringing, *inter alia,* claim 15 of his '833 patent.

Hence all the elements necessary to start the laches delay period were in place by no later than March, 1973. Lemelson knew or should have known of Brown & Sharpe's alleged infringing activities at that time. March, 1973, marks the latest conceivable date for the beginning of plaintiff's delay.

Plaintiff challenges the conclusion that its period of delay commenced no later than in 1973. Indeed plaintiff maintains that there was, in fact, no delay whatsoever in bringing suit. (D.I. 88 at 6–14.)

Plaintiff cites several cases for the proposition that where an alleged infringer's conduct changes over time—as, for example, where the infringer begins to manufacture a different product—a new period of delay begins for laches purposes with each change in conduct, unless the infringer can show that its prior conduct is substantially similar to the more recent conduct. *Celotex Corp. v. Jacuzzi Whirlpool Bath, Inc.,* 211 U.S.P.Q. 232, 233 (N.D.Ill.1980); *Nordson Corp. v. Graco, Inc.,* 187 U.S.P.Q. 119, 120 (N.D.Ohio 1975). *See also MGA, Inc. v. Centri–Spray Corp.,* 699 F.Supp. 610, 612, 615 (E.D.Mich.1987); 4 D. Chisum, *Patents,* § 19.05[2][a][ii] at 19–169 to 19–170. In other words, the delays associated with periods of infringement by different machines do not "tack" unless the nature of alleged infringement remains substantially constant throughout the relevant time periods. If the products sold by a defendant *within 6 years* preceding a lawsuit are not functionally equivalent to products sold *more than 6 years* prior to the lawsuit, then there is no reason why laches would bar a plaintiff's infringement claim as to the more recent sales (i.e. those within the last 6 years), because it is essentially a different claim of infringement. *MGA, Inc. v. Centri–Spray Corp.,* 699 F.Supp. at 615.

Applying the foregoing legal theory to the facts of this case, even though laches would preclude plaintiff from recovering damages for infringement by Brown & Sharpe in the early 1970's, laches would not bar recovery for post–1976 infringement *if* the nature of defendant's conduct had changed significantly.[27] Thus the

October 26, 1979. (D.I. 79 at 2.) Even giving plaintiff the benefit of every doubt and assuming that the delay ceases at the time notice was *sent* (September, 1979), plaintiff still cannot escape a finding of laches in this case.

**27.** The significance of the year 1976 lies in the language of plaintiff's Complaint, which has been amended to now allege that "Defendant has, *since 1976* ..., willfuly [sic], infringed

claim 15" of the '833 patent. (D.I. 67 at ¶ 6 [emphasis added].)

Of course a plaintiff otherwise guilty of laches cannot avoid the consequences of the defense simply by narrowing its charge so as to complain only of infringement occurring within the 6 years immediately preceding commencement of the lawsuit. If such a theory were accepted, the laches defense would be stripped of all meaning, for any protection afforded the defen-

linchpin of plaintiff's argument is that somehow Brown & Sharpe's alleged infringing conduct changed materially between March, 1973, and 1976.

Plaintiff's argument is without merit on the facts of this case. The contention that Brown & Sharpe's pre–1973 equipment is not functionally equivalent to its post–1976 machines in all ways pertinent to the instant action, is little more than a makeweight and afterthought argument, recently concocted in hopes of avoiding the laches defense. The notion that Brown & Sharpe's measuring machines produced since 1976 differ materially from their pre–1973 counterparts is belied by Lemelson's own statements made in letters written during the 1969 to 1973 time frame, and by his encounter with Brown & Sharpe at the 1970 trade show.

Plaintiff cannot be heard to now argue that Brown & Sharpe's machines have changed materially *because* the newer machines include touch sensitive probes or operate under direct computer control. The Court has already found in Part I.C. of this opinion, *supra,* that even the older Brown & Sharpe machines of the early 1970's boasted such features. Thus the inclusion of touch sensitive probes and direct computer control in the later (i.e. post–1976) machines does not represent a change at all.

Furthermore, even if the later machines had in fact changed in such a manner, the change was not a *material* one rising to the level of a *substantial* difference. Lemelson's letters to Brown & Sharpe disclose that the opposite is true. "Claims 1 and 15 [of the '833 patent] are not limited to any particular type of probe...." (PX 36; DX D [letter dated November 20, 1970, from Lemelson to Brown & Sharpe].) "[C]laims 15–18 of [the '833 patent] do not call for or require computer controlled op-

eration of the measuring machine." (PX 39; DX G [letter dated July 20, 1971, from Lemelson to Brown & Sharpe].) Thus any such change in the attributes of the Brown & Sharpe equipment would have been an insignificant change—at least in the context of this case, which alleges infringement of claim 15 of the '833 patent.

At trial plaintiff pointed to another would-be source of material change in the Brown & Sharpe machines. Plaintiff argues, inconsistently with its previous position, that Brown & Sharpe machines of earlier vintage (i.e. pre–1973) did not in fact infringe the '833 patent. In contrast the post–1976 machines are said to infringe. Thus, says plaintiff, the post–1976 machines are not functionally equivalent to the pre–1973 machines; a different cause of action arose in 1976, resulting in a new delay period which is less than 6 years and does not constitute laches. (*See* D.I. 88 at 8–14.)

Plaintiff's argument fails for several reasons. First and foremost, its past statements compromise the veracity of its present position. At the 1970 trade show, Lemelson accused Brown & Sharpe pointblank of infringing his patent at that time. (*See* DX AZ at 7–8, 20 [Businger deposition].) Subsequent letters penned by Lemelson and his patent attorneys are in a similar vein: "the construction and operation of the Validator 100 come within the purview of Claims 1 and 15, respectively, of the ['833] patent" (PX 34; DX C [letter dated November 6, 1970]); "I cannot accept the general decision by you and your management that your 'machine does not fall within the purview of the ['833] patent'" (PX 39; DX G [letter dated July 20, 1971]); "it is evident ... that the Validator 100 indeed operates in a manner substantial disclosed in the ['833 patent]" (PX 48 [letter dated February 27, 1973]).[28]

dant by laches as so construed would already be available to defendant by virtue of the statutory limitation contained in 35 U.S.C. § 286. *See* Part II. of this Opinion, *supra.*

**28.** The Court considers plaintiff's view of defendant's conduct to be highly relevant, and in so doing finds support in *A.C. Aukerman Co. v. Miller Formless Co., Inc.,* 693 F.2d 697 (7th Cir.

1982). *Aukerman* was a suit charging infringement of two related patents. *Aukerman,* 693 F.2d at 699–700 & n. 4. The first patent (a method claim) was issued *more* than 6 years before filing suit. *Id.* at 699. The second patent (an apparatus claim) was issued *less* than 6 years before the suit. *Id.* The court in *Aukerman* found laches as to both patents, even that

Secondly, in arguing that Brown & Sharpe's pre–1973 equipment did not infringe, plaintiff emphasizes at length one function which that equipment could perform—namely, measuring hole centers and diameters—and contrasts this function with the measurement technique contemplated by claim 15 of the '833 patent. (*See* D.I. 88 at 9–14.) Claim 15 describes a method for measuring the distances between points on two different surfaces of a workpiece. *See supra* notes 22–23 and accompanying text.

Plaintiff's emphasis on the undisputed fact that early Brown & Sharpe machines could locate hold centers and measure hole diameters falls short of convincing this Court that such machines did not infringe claim 15 of plaintiff's '833 patent. Determining the diameter of a hole on a workpiece quite plausibly *is* a measure of the distance between points on two different surfaces of a workpiece.[29] In that respect, such a measurement *could* come within the ambit of claim 15.[30]

Moreover, while scrutinizing one function of the early Brown & Sharpe machines, plaintiff ignores other functions which the machines were capable of performing. Contemporaneous documents indicate that Brown & Sharpe's measuring machines of the early 1970's were in fact able to measure distances between different surfaces on a workpiece. (*See* D.I. 37, Ex. E [the validator 100 is capable of taking "measurements along three mutually perpendicular axes"]; DX N [the "Validator 100 provides fully automatic coordinate measurement of work up to 36" (X), 24" (Y) and 18" (Z)"]; DX O ["[t]he Validator–100 computer-controlled measuring machine inspects diameters ..., center distances, and regular coordinate dimensions of a workpiece simultaneously"].)

In rejecting plaintiff's argument that defendant's pre–1973 machines are dissimilar from its post–1976 machines *because* the former did not infringe the '833 patent, the Court notes another fallacy in plaintiff's reasoning. Plaintiff represents that the laches defense cannot succeed unless defendant proves that it did in fact infringe the '833 patent in the early 1970's. (*See* D.I. 88 at 4 [the laches defense "must fail because there was no infringement" in the early 1970's]; D.I. 88 at 9 n. 9 [Brown & Sharpe "has the burden of showing the early infringement in order to start the laches period"].)

■ Plaintiff's assertions are simply incorrect. Proof of actual infringement is not a necessary element of the laches defense. If it were, a "mini-trial" on the issue of laches would hardly enhance the efficient administration of justice. Evidence relating to the crucial issue of the case-in-chief (i.e. whether or not defendant infringed) would necessarily be absorbed into the trial on the laches subissue.

In upholding defendant's laches defense, the Court need not and does not decide whether Brown & Sharpe ever in fact infringed. The Court simply concludes that *if* Brown & Sharpe did infringe, such infringement: (a) occurred in the early 1970's, (b) was known to or should have been known by Lemelson by no later than March, 1973, and (c) any post–1976 infringement was of the same nature as any pre–1973 infringement.

In positing that its delay in suing for post–1976 infringement should not be "tacked" onto any delay in suing for pre–1973 infringement, plaintiff relies heavily upon *Celotex Corp. v. Jacuzzi Whirlpool Bath, Inc.*, 211 U.S.P.Q. 232 (N.D.Ill.1980).

which was issued within 6 years prior to filing suit. Much like this Court, which examines Lemelson's view of Brown & Sharpe's conduct in the early 1970's, the court in *Aukerman* also focused upon plaintiff's view of defendant's conduct: "In the license negotiations between the parties ... plaintiff viewed the invention as both apparatus and method, and defendant's alleged infringement as a single intrusion." *Id.* at 700 n. 4.

**29.** The diameter of a hole on a workpiece is another way of describing the distance between opposite walls on the inside of a cylinder.

**30.** The inquiry would depend upon whether opposite points on the inside of a cylinder are deemed to lie on one surface or on two. The Court will not undertake to answer this question.

*Celotex v. Jacuzzi* differs from this case, however.

The plaintiff in *Celotex v. Jacuzzi* originally accused the defendant, in 1966, of infringing four of the claims within plaintiff's patent: claims 1, 2, 6, and 8. 211 U.S.P.Q. at 232. Soon thereafter, plaintiff retracted its charges of infringement as to two of the claims: claims 2 and 8. *Id.* Some ten years later, in 1976, plaintiff in *Celotex v. Jacuzzi* brought suit against defendant. *Id.* The suit charged defendant with infringing two of plaintiff's patent claims—claims 4 and 8—by its sale of a product first produced after 1973. *Id.* The court in *Celotex v. Jacuzzi* denied defendant's motion for summary judgment on the basis of laches, declining to hold that plaintiff's period of delay tacked to the time of its earliest accusations of infringement in 1966. *Id.* at 233.

*Celotex v. Jacuzzi* is distinguishable from this case for at least three reasons. First, while the court in *Celotex v. Jacuzzi* declined to find laches as a bar to claim 4, the earlier accusations of infringement had never mentioned claim 4. In contrast, plaintiff in the instant case specifically accused defendant of infringing claim 15 of the '833 patent many years before it filed suit.

A second basis for distinguishing *Celotex v. Jacuzzi* is that the early accusations of infringement of claim 8 had been promptly retracted by plaintiff. Conversely, the plaintiff in this case did not seek to withdraw its early accusations of infringement of claim 15 until many years later, when the threat of laches loomed imminent.

Finally, it bears emphasis that the cited decision in *Celotex v. Jacuzzi* was rendered in the context of a summary judgment motion. The court there did not hold that defendant could not prevail on its laches defense. Rather, the court merely referred to disputed issues of fact and held that "summary judgment on the basis of laches ... would be inappropriate *at this time.*" *Id.* at 233 (emphasis added). Unlike *Celotex v. Jacuzzi*, here a trial was held on the issue of laches, and this Court has resolved the disputed questions of fact based on the evidence adduced at trial.

Having distinguished *Celotex v. Jacuzzi*, the Court finds that the instant case more closely resembles *Gillons v. Shell Co. of California*, 86 F.2d 600 (9th Cir.1936), *cert. denied*, 302 U.S. 689, 58 S.Ct. 9, 82 L.Ed. 532 (1937). The plaintiff in *Gillons* first accused defendant of infringement in 1921. *Id.* at 602. An infringement action was not brought until 1930. *Id.* at 601. When confronted with the laches defense, plaintiff suddenly trumpeted the importance of a certain feature (perforated plates) included in defendant's allegedly infringing mechanism, which feature first came to plaintiff's attention in 1929. *Id.* at 604. The court in *Gillons* nevertheless affirmed a finding of laches. *Id.* at 611. The court observed that if plaintiff believed that structures without perforated plates infringed—as plaintiff had charged in 1921—then it is difficult to see why plaintiff had to wait until learning of defendant's use of perforated plates in 1929 before filing suit. Like the court in *Gillons*, this Court cannot reconcile the reasons given by plaintiff for not bringing suit until September, 1979, with its previous allegations of infringement made in the early 1970's.

For all of the foregoing reasons, the Court repeats its conclusion that March, 1973, marks the latest possible time for the beginning of plaintiff's delay.

## C. *The Presumption of Laches*

Since the start of plaintiff's delay in bringing suit (March, 1973) precedes the end of the delay (September, 1979) by more than 6 years, laches is presumed. *Leinoff v. Louis Milona & Sons, Inc.*, 726 F.2d 734, 741–42 (Fed.Cir.1984). The burden therefore shifted to plaintiff, who was required to rebut the presumption of laches by proving that *both:* (1) its delay was reasonable, *and* (2) its delay did not injure defendant. *See Jamesbury v. Litton Indus. Products, Inc.*, 839 F.2d 1544, 1552 (Fed.Cir.1988). Although plaintiff endeavored to show that it had not in fact delayed

in filing this suit,[31] it did not otherwise attempt to prove that its delay was reasonable, let alone that defendant was not prejudiced thereby.[32]

Hence the presumption of laches remains intact, subject only to plaintiff's final argument which is now addressed.

### D. *Egregious Conduct Argument*

Plaintiff's final argument is that Brown & Sharpe engaged in egregious conduct and therefore cannot rely upon the laches defense. *See Bott v. Four Star Corp.*, 807 F.2d 1567, 1576 (Fed.Cir.1986); *TWM Mfg. Co., Inc. v. Dura Corp.*, 722 F.2d 1261, 1268 (6th Cir.1983). This is essentially an "unclean hands" argument. *See E.T. Mfg. Co., Inc. v. Xomed, Inc.*, 679 F.Supp. 1082, 1085 (M.D.Fla.1987); *Coleman v. Corning Glass Works*, 619 F.Supp. 950, 955 (W.D.N.Y.1985), *aff'd*, 818 F.2d 874 (Fed.Cir.1987). In advancing the egregious conduct/unclean hands argument to rebut a presumption of laches, plaintiff bears the burden of proof. *Bott v. Four Star Corp.*, 807 F.2d at 1576 ("plaintiff could defeat the [laches] bar by showing that the defendant was guilty of egregious conduct"); *Watkins v. Northwestern Ohio Tractor Pullers Ass'n, Inc.*, 630 F.2d 1155, 1159 (6th Cir.1980) ("[t]o overcome this presumption of laches, the patentee must show ... [that] the infringer engaged in particularly egregious activities").

Plaintiff attempts to portray Brown & Sharpe as having behaved egregiously in that it knew of Lemelson's '833 patent and yet continued to develop, manufacture, and sell various coordinate measuring machines which allegedly infringed the patent, all the while denying infringement. (*See* D.I. 88 at 2, 5, 14–25.) If plaintiff's conclusory argument were adopted as the standard, any conduct which was ultimately held to infringe a patent would be cast as "egregious" conduct. Such a result, of course,

is not what is intended by this exception to the laches defense.

 To find "egregious conduct," there must be a showing of some exceptional character, "such as where the one asserting the defense of laches was responsible for the plaintiff's delay, or allayed the plaintiff's suspicion through deception," *Coleman v. Corning Glass Works*, 619 F.Supp. at 955, or "evidence of wilful misconduct or fraud on the part of defendant." *Lemelson v. Carolina Enterprises, Inc.*, 541 F.Supp. 645, 654 n. 25 (S.D.N.Y.1982). Here, plaintiff has simply failed to meet its burden of showing that Brown & Sharpe engaged in any such conduct.

The mere fact that Brown & Sharpe denied infringing plaintiff's patent is not an example of egregious conduct. *Cf. Gillons v. Shell Co. of California*, 86 F.2d 600, 602 (9th Cir.1936) ("In view of his [i.e. plaintiff's] definite charge of infringement and threat of suit, it is not reasonable to suppose that an experienced lawyer would have been lulled into security by the bare denial of the alleged infringer.").

### IV. CONCLUSION

For the reasons outlined in this Opinion, the Court concludes that defendant has successfully made out its defense of laches. If plaintiff had a valid cause of action, it was certainly aware of such by March, 1973, at the latest. Plaintiff should have filed its complaint at that time, or at least within the next 6 years, by March, 1979. It failed to do so, and is therefore guilty of laches. Accordingly, the Court will enter judgment in favor of the defendant and against plaintiff.

---

**31.** The Court rejected this argument in Part III.B., *supra,* finding that plaintiff had indeed delayed, beginning at the latest in March, 1973.

**32.** In its post-trial brief, plaintiff claims that "there is no prejudice [to defendant] because

there was no delay in fact." (D.I. 88 at 6–14.) That section of plaintiff's brief was devoted to the question of delay; it did not entertain the issue of prejudice to defendant.